## HERSTEIN et al. v. KEMKER.

Western Section.   January 10, 1936.

Petition for Certiorari denied by Supreme Court, May 16, 1936.

Armstrong, McCadden, Allen, Braden & Goodman, H. H. Barker and Charles G. Morgan, all of Memphis, for plaintiffs in error.
Lowell W. Taylor, of Memphis, for defendant in error.

FAW, P. J. Two cases, brought and docketed separately, were, by order of the court, tried together to a jury in division 2 of the circuit court of Shelby county, and have been brought to this court in one transcript, with a single bill of exceptions, and docketed here under the above style.

In one of the two cases Mrs. W. R. Herstein (sometimes described in the record as Mrs. Irene Herstein) was the plaintiff, and her husband, W. R. Herstein, was the plaintiff in the other case. The defendants in each of the two cases were the same, viz., G. H. Kemker, a resident citizen of the city of Memphis, and the Newberger Company, a Tennessee corporation, with its situs in Memphis.

In the course of the trial below, and before the close of the evidence, the plaintiffs took a voluntary nonsuit in their respective cases against the Newberger Company, and the cases were finally tried to the jury against G. H. Kemker as the sole defendant.

It is an admitted fact on the record that Mr. and Mrs. Herstein were struck, practically at the same time, by an automobile driven by defendant Kemker, and it also appears, without dispute in the evidence, that each of the plaintiffs suffered serious, painful, and probably permanent, personal injuries as the result of the collision.

Averring that her injuries were proximately caused by negligence of defendant Kemker, in the particulars stated in her declaration, Mrs. Herstein sued defendant Kemker for $30,000 as damages, both actual and punitive, for her personal injuries; and, upon averments of the same negligence, W. R. Herstein sued for $30,000 as damages, both actual and punitive, for (1) personal injuries to himself, and (2) loss of services of his wife, and expense of medical, hospital, ambulance, and nurse's and doctor's bills incurred "in an effort to have his wife cured."

To each of the declarations, the defendants filed two pleas, viz.: (1) The general issue of not guilty, and (2) that the plaintiff's injuries, if any, were received as a direct and proximate result of the plaintiff's own contributory negligence. Later, in obedience to an order of the trial court, made on motion of plaintiffs, requiring defendants to "specially plead their affirmative defenses," the defendants filed a statement of certain special defenses, to which more particular reference will be hereinafter made.

After the close of the plaintiffs' evidence in chief and during the examination of defendant Kemker as the first witness in his behalf, the plaintiffs were permitted to "withdraw any claim for punitive damages."

The two cases were submitted to a jury upon evidence on behalf of the plaintiffs and defendant Kemker, respectively, argument of counsel for the respective parties, and the charge of the court, whereupon the jury found "for the defendant," and the court rendered judgment in each of the two cases that the defendant go

hence and recover of the plaintiff and the plaintiff's surety the costs of the cause. In due season, each of the plaintiffs filed a motion for a new trial which was overruled by the trial court, and the plaintiffs, separately, excepted to the action of the court and prayed an appeal in the nature of a writ of error to this court, which was granted by the trial court and perfected by the respective plaintiffs. The case has been heard by this court on the record, with assignments of error on behalf of Mr. and Mrs. Herstein, and excellent briefs and oral arguments by able counsel for the parties, respectively.

For convenience, we will continue to refer to Mr. and Mrs. Herstein as plaintiffs, and to G. H. Kemker as defendant.

It is not claimed, either through an assignment of error or otherwise, that there is no evidence to support the verdict of the jury, and, in their brief, plaintiffs' counsel disclaim an intention to argue on this appeal the weight of the evidence; but it is strongly urged that there were sharp conflicts in the testimony of the witnesses, with respect to controlling and determinative facts, which emphasizes the asserted materiality and prejudicial effect of certain rulings of the court below, which rulings are assigned as error.

It is insisted that there was an abundance of evidence before the jury which would have sustained verdicts in favor of both plaintiffs, but it is, in effect, conceded by learned counsel for plaintiffs that it is not within the province of this court to determine the comparative weight of the evidence for the parties, respectively, and that the verdicts of the jury in these cases will not be disturbed unless there was error prejudicial to the plaintiffs in the rulings of the trial court.

However, a consideration of the evidence before the jury, in connection with the issues made by the pleadings, will be necessary in order to properly dispose of certain assignments of error; but there are other assignments of error, which challenge rulings of the court, made before the cases were taken up for trial below, which may be properly disposed of without regard to the evidence and the conduct of the trial before the jury. The several questions presented by the assignments of error will be stated and considered in the order which to us seems most convenient, rather than in the order of their assignment.

1. Mrs. Herstein's case was begun by the issuance of a summons from the circuit court of Shelby county on November 20, 1934, and her declaration was filed on that day. On the same day, the summons was issued in Mr. Herstein's case from the same court, and his declaration was also filed on that day. Mrs. Herstein's case was numbered 84,789, and Mr. Herstein's case was numbered 84,790, on the docket of said court.

The circuit court of Shelby county is divided into four parts, to

be known and designated as "Division 1, 2, 3 and 4," with a "Circuit Judge" presiding in each division. Acts 1905, chapter 102.

It is provided by section 5 of the statute just cited (and by the Acts 1907, chapter 371, amendatory thereof) that "the judges presiding in Divisions 1, 2, 3, and 4 of said court shall formulate such rules and regulations as may be necessary to apportion the docket of said Circuit Court between the four divisions thereof, and the Clerk of the said court will, under the rules so established, apportion and divide said docket between the four divisions, assigning to each division for trial and disposition a proper proportion of the docket." The bill of exceptions in the cases now before us contains recitals as follows:

"In the Circuit Court of Shelby County, Tennessee, when suits are filed they are regularly assigned in the order in which they are filed to the four divisions of said Circuit Court,—Divisions One, Two, Three and Four,—for trial. These assignments are made in rotation by the Circuit Judges.

"When the suits of Mrs. Irene Herstein vs. G. H. Kemker, et al., No. 84,789 T. D., and W. R. Herstein vs. G. H. Kemker, et al., No. 84,790, T. D., were filed the case of Mrs. Irene Herstein vs. G. H. Kemker, et al., No. 84,789 T. D., was assigned to Division Two of the Circuit Court, and the case of W. R. Herstein vs. G. H. Kemker, et al., No. 84,790 T. D., was assigned to Division One of the Circuit Court of Shelby County, Tennessee.

"When the calendar in Division Two of the Circuit Court was called, on the 6 day of March, 1935, the case of Mrs. Irene Herstein vs. G. H. Kemker, et al., No. 84,789 T. D., was set for trial on the 16th day of April, 1935. When that case was called for trial on that date the case of W. R. Herstein vs. G. H. Kemker, et al., No. 84,790 T. D., was still pending in Division One of the Circuit Court and had not been set for trial in that division, nor had it appeared on any calendar of cases to be called for trial in that division.

"On the 16th day of April, 1935, the following rules of the Circuit Court of Shelby County, Tennessee, were in full force and effect. . . .

"All cases on the appearance docket and reference docket and cases appealed from the Magistrates' courts shall be assigned for trial by one of the Circuit Judges, the Judge assigning cases shall perform this duty during a term of court and will undertake the work in the regular order of divisions, namely, Division 1, 2, 3 and 4 and the cases shall be assigned by the Judges in so far as practicable so as to make the work in each division equal.

"The Judges will, from time to time, equalize the work in each division so as to keep each one of the divisions as nearly up with the work of the court as possible.

"On April 16, 1935, Judge H. W. Laughlin, Div. 4 Circuit Court,

Shelby County, Tennessee, was the Judge performing the duty of assigning cases.''

It further appears from the bill of exceptions that when Mrs. Herstein's case No. 84,789 was called for trial (on April 16, 1935) in division 2 of the circuit court, defendant's counsel said to the court:

''There is another case growing out of this same accident and I move the Court that you now require the two cases to be tried together. They both grow out of the same accident. Mr. Herstein is suing in one case and Mrs. Herstein suing in the other. I don't think we ought to take up the time of the parties, the Court and the jurors to try the cases separately;'' to which plaintiffs' counsel replied: ''I don't understand your Honor has any statutory authority to require us to try them together.''

Then followed an extended colloquy between counsel and the court with respect to the propriety of a joint trial of the two cases and the right of the court to so order, over the objection of plaintiffs, after which the court ruled that the two cases should be tried together, provided the presiding judge of division 1 would transfer the W. R. Herstein case to division 2, and that there was no objection to plaintiffs' counsel presenting his views to the presiding judge of division 1.

Thereupon, counsel for both parties went into division 1 of the circuit court before Judge Harry M. Adams, and defendant's counsel moved the court to transfer Mr. Herstein's case, No. 84,790, to division 2 of the circuit court ''in order that the two cases may be tried together;'' to which plaintiffs' counsel objected.

Counsel agreed in their statements to Judge Adams that Judge Capell had ruled that, if both cases were in his division, he would order that they be tried together. After hearing argument of counsel on the motion, Judge Adams directed that Mr. Herstein's case, No. 84,790, be transferred to division 2 of the circuit court, to which action of the court plaintiffs excepted. Thereupon counsel for both parties returned to division 2 and proceeded with the selection of the jurors for the joint trial of the two cases.

The plaintiffs assign as error the action of Judge Adams in transferring W. R. Herstein's case to division 2 of the circuit court, and also assign as error the action of Judge Capell in ordering that the two cases be tried together.

In the circuit court counsel for plaintiffs rested his objection to the transfer of case No. 84790, from division 1 to division 2, and his objection to the joint trial of the two cases, upon the absence of statutory authority for such action. To Judge Adams, plaintiffs' counsel said: ''The whole point is, in the absence of some statutory authority, there is no authority to do so, and I have a

right, which I stand on;" and to Judge Capell plaintiffs' counsel made substantially the same statement.

Plaintiffs' counsel conceded that "the facts about how the accident occurred are the same," but stated that "the facts as to the damages are different."

For defendant, it was contended below, and is insisted here, that the two cases were merely on the dockets of different divisions of the same court, and not in different courts; that it was within the discretionary powers of the presiding judge of any division to transfer a case on his docket to another division for any proper purpose; that as these two suits grew out of the same accident and the defendants were the same, it would save the county much expense, save the court much time and labor, and save the parties much expense and time, without prejudice to the plaintiffs, to try the two cases together.

Judge Capell stated that he had "followed a practice of requiring cases growing out of the same accident to be tried together," for the reason that "the calendars of the Circuit Court are congested, and it is to the great advantage of litigants and lawyers to keep the calendar as well up as possible," and if such cases are thus tried together, much time is saved.

Judge Adams said:

"I know there has been, as a matter of practice, where two cases grow out of the same state of facts, unless some glaring inconvenience or wrong would be done the plaintiff, that they be tried together.

"In view of Judge Capell's statement that he would try the two cases together, if they were in his court, I think this being only one court, you might say, the Circuit Court with four divisions, I would be constrained to transfer the case. So, with that statement, I think I ought to make the transfer, Mr. Armstrong."

In this court, the plaintiffs insist (as they did in the circuit court) that their objection to the joint trial of the two cases, and to the transfer of case No. 84,790 from division 1 to division 2 for that purpose, should have been sustained because of the absence of statutory authority for such compulsory transfer and joint trial.

It is further argued here, for plaintiffs, that the transfer of Mr. Herstein's case from division 1 to division 2 for the purposes of an immediate trial was in violation of section 8796 of the Code, which provides that "causes, except those given preference by law, thus docketed shall be tried and disposed of in their order, unless the parties consent to a different arrangement or rules of practice otherwise provide."

And in support of the contention just stated, counsel cite the case of Memphis & O. Railroad Co. v. Dowd, 9 Heisk., 179, in which it was held that an "arbitrary departure" from the provisions of said

statute (then section 2947 of the Code of 1858), to the prejudice of the complaining party, was reversible error; but in that opinion it was held (at page 185 of 9 Heisk.), that the Code section above quoted "is not imperative, but leaves the Judge to exercise a proper discretion, yet it is so far obligatory that an arbitrary departure from it is error;" and it was there held, upon the facts of that case (which were in no material respects parallel to the instant case), that "the Judge failed to exercise his discretion justly and properly in over-ruling the objection of the counsel of plaintiff in error to taking up the case out of its order, and in proceeding to empanel a jury against his protestations."

In the earlier case of Van Brocklin v. Wolcott, 5 Heisk., 743, 745, it was held that Code section 2947 (now section 8796) "is not imperative, but directory in its terms."

We are of the opinion that the question as to whether or not the two cases should be tried together rested in the sound judicial discretion of the circuit court. So far as we are aware, the point is not ruled by any decision of the appellate courts of this state; but it has been the subject of judicial decision in numerous cases from other jurisdictions. In the state of Kentucky it is well settled by a long line of decisions that, where separate actions are brought by different plaintiffs against the same defendant, and the issues are the same in each action, the court may, in order to avoid unnecessary delay and expense, order them to be tried together; that whether such cases should be tried together is a matter within the discretion of the trial court and such discretion will not be interfered with on appeal, unless it clearly appears that the discretion was abused; that such practice is not only proper, but should be encouraged, unless there is objection from one of the parties and the circumstances are such that the trial of the cases together would tend to place the objecting party in a position not occupied by his adversaries and that would probably give the latter an undue advantage in the trial. Benge's Adm'r v. Fouts, 163 Ky., 796, 174 S. W., 510, 515; Reid v. Nichols, 166 Ky., 423, 179 S. W., 440; Farrar v. Hank, 205 Ky., 89, 265 S. W., 487, 488; Herndon v. Kentucky Traction & Terminal Co., 214 Ky., 36, 281 S. W., 1036, 1037; Sheetinger v. Dawson, 236 Ky., 571, 33 S. W. (2d), 609, 610; Warfield Natural Gas Co. v. Wright, 246 Ky., 208, 54 S. W. (2d), 666, 672; City of Ashland v. Queen, 254 Ky., 329, 71 S. W. (2d), 650, 654.

In Sheetinger v. Dawson, supra, separate suits were brought by a husband and his wife against the same defendant, as in the present case, for damages resulting from the same automobile collision. The lower court ordered a joint trial over the objection of the defendant, and, on appeal, it was held that this was error, for the

reason that neither of the plaintiffs could be excluded from the court-room, and, as they were both competent witnesses and each could hear the other testify (which they could not do on separate trials), the plaintiffs would thus derive an undue advantage through a joint trial. But in the instant case, the conditions are the reverse of those in Sheetinger v. Dawson, in that, here the joint trial was sought and obtained by the defendant, and each plaintiff thereby obtained the advantage of hearing the other testify. "A party cannot complain of an error which operates favorably to him." 2 R. C. L., p. 237, par. 197; and defendant is not complaining, and could not complain of a ruling which he invited the trial court to make. 2 R. C. L., p. 238, par. 198.

In Yardley v. Rutland Railroad Co. (Ruskin v. Rutland Railroad Co.), 103 Vt., 182, 153 A., 195, 196, the court said:

"Arthur Yardley drove an automobile which he hired from Abe Ruskin against one of defendant's freight cars that stood on a grade crossing of the latter's railroad. Yardley sustained personal injuries, and the automobile was badly damaged. Each party brought an action against the defendant predicated upon its negligence; Yardley to recover for his injuries, and Ruskin to recover for the damage to his automobile. The negligence relied upon was the same in both cases, the same counsel represented the respective parties in both, they were pending in the same court, and were ripe for trial. The trial court of its own motion ordered them tried together, to which each plaintiff excepted. These exceptions present the first question for review.

"These cases were not consolidated, but were simply tried together, and a separate judgment entered in each. This is spoken of in some of the cases as a consolidation. So, too, is the procedure under the so-called 'consolidation rule' introduced into the English courts in the time of Lord Mansfield under which in certain instances a stay of proceedings was ordered in all but one of several cases, and the result reached in that case was made the basis for the disposition of the others. The failure to distinguish between these methods of procedure, neither of which, strictly speaking, is a consolidation, and actual consolidation, where several suits are merged and thereafter proceed to judgment as a single action, is doubtless responsible for some of the conflict found in the cases. Then, too, the procedure in the federal and many of the state courts respecting consolidation and the trial of several actions together is regulated by statute, which leads to still further confusion. The result is that no universal, or general, rule is deducible from the authorities. . . .

"A careful examination of the question satisfies us that the court did not err in trying these cases together. They grew out of the

same accident, and, so far as the defendant's negligence was concerned, depended upon precisely the same evidence. While the question of Yardley's contributory negligence was involved in his case, or might be, and was not in the other, that issue was so clean cut that it is not apparent how Ruskin could have been harmed by a joint trial if that matter was properly dealt with by the court, and Yardley certainly could not have been.''

In Azinger et ux. v. Pennsylvania Railroad Co., 262 Pa., 242, 105 A., 87, 88, Azinger and his wife were injured by a collision with defendant's train at a grade crossing when an automobile in which they were riding, and driven by the husband, was struck by one of defendant's freight trains. Two actions were brought, one by the husband for his injuries, and the other by the husband and wife for injuries received by the latter. The trial judge ordered the cases tried together, and, on appeal, this was assigned as error. The court said:

''The court's action was not such a consolidation of the two proceedings as to merge the two actions into one, but merely an order directing they be tried together in view of the fact that the cases were of the same nature, arose out of the same transaction, and depended in each case upon substantially the same proofs, and was made in the interest of justice and for the purpose of avoiding unnecessary delay and expense.

''A reference to the distinction between consolidation of two or more actions, and ordering them tried together, is sufficient to show the action of the court was proper. The term 'consolidation' is used in three different senses: First, where all except one of several actions are stayed until one is tried, in which case the judgment in the one is conclusive as to the others; second, where several actions are combined into one and lose their separate identity and become a single action in which a single judgment is rendered; and, third, where several actions are ordered to be tried together but each retains its separate character and requires the entry of a separate judgment. Lumiansky v. Tessier, 213 Mass., 182, 99 N. E., 1051, Ann. Cas., 1913E, 1049. Failure in many cases to clearly distinguish between these various uses of the word has caused no little apparent confusion in the decisions. Where a technical consolidation takes place, the result is that one verdict is rendered which is conclusive of the entire subject-matter of the litigation. 1 Corpus Juris, 1128, par. 324. Consequently, different actions cannot be consolidated unless between the same parties and involving the same subject-matter, issues, and defenses. 1 Corpus Juris, 1124, 1127. But where separate actions in favor of or against two or more persons have arisen out of a single transaction, and the evidence by which they are supported is largely the same, although the rights and liabilities of parties may differ,

it is within the discretion of the trial judge to order all to be tried together, though in every other respect the actions remain distinct and require separate verdicts and judgments. . . .

''The question is one that must necessarily be left to the discretion of the trial judge, and where the issues are the same and they arise out of the same transaction, and it does not appear the trial of the cases together would tend to place the objecting party at a disadvantage, or give an undue advantage to his adversary, the action of the court in ordering the cases tried together will not be reversed.''

The prevailing rules with respect to the propriety of joint trials, as announced in numerous cases cited in the footnotes, are stated in the text of 64 C. J., at pp. 35, 36, as follows:

''A court may order several causes pending before it to be tried together where they are of the same nature, arise from the same act, event, or transaction, involve the same or like issues and depend largely or substantially on the same evidence and a joint trial will not give one party an undue advantage or prejudice the substantial rights of any party. This is true not only where the parties in the several actions are the same, but also where some of the parties are different, as where the actions were brought by the same plaintiff or plaintiffs against different defendants or by different plaintiffs against the same defendant or defendants. The order may be made, although defendants employ different counsel. Indeed it is held or stated that such an order may be made even though there are differences in the character of the actions, the rights and liabilities of the parties or the evidence. Where, in actions by different plaintiffs against the same defendant or defendants, the only difference is in respect of the issues of contributory negligence of the several plaintiffs, the extent of the injuries or damages sustained by them, or the evidence relating thereto, the cases may be ordered to be tried together. Even where two actions are so inconsistent as to vital matters that, without a stipulation, the parties would be compelled to try them separately, yet where the parties stipulate that the actions shall be tried together before the same jury, there is no reason for the court to refuse to allow them to carry out their stipulation. However, two causes can be tried together only by order of court or consent of the parties. The object of trying several cases together is to serve the convenience of the court and litigants and avoid unnecessary costs, delay, and vexation in the attainment and administration of justice; and, independent of statutory authority, a court of general jurisdiction has inherent power to order such a trial under proper circumstances. Ordinarily, it rests in the discretion of the court to grant or refuse an application to consolidate causes for trial; but there may be instances in which the application should be granted;

and there may be other instances in which causes should not be ordered to be tried together, over objection, as where one plaintiff, although he would be a competent witness for himself, would not be a competent witness for another plaintiff, the interests of justice seem more likely to be promoted by separate trials, or a trial together would tend to confuse court, counsel, and jury, put one party at a disadvantage or deprive him of a substantial right to which he is entitled under the law. Error in ordering a trial of separate causes together is harmless if the final result reached was right.''

Three cases (Bishop et al. v. Bishop, 164 S. C., 493, 162 S. E., 756, 757, Rhoads v. Booth, 14 Iowa, 575, 576, and Kimatian v. New England Tel. & Tel. Co., 49 R. I., 146, 141 A., 331, 333) are cited on the brief for support of plaintiff's contention that, ''in the absence of statutory authority, the action of a trial court in consolidating causes or in advancing causes for trial over the objection of one of the parties, constitutes reversible error.''

In Bishop et al. v. Bishop, supra, ''five cases were consolidated and tried at one time before the same jury.'' The Supreme Court of South Carolina held that the trial court erred in thus ''consolidating'' the five cases, and the judgments were reversed and the causes remanded for a new trial. In the opinion, the Supreme Court treated the effect of the order of the trial court as a technical ''consolidation'' of the five causes, and held that, as the ''five plaintiffs could not have joined their five causes of action in the same complaint,'' the cases could not be properly ''consolidated'' for trial.

In the instant case, the two cases were not ''consolidated'' so as to lose their separate identity and become a single action in which a single judgment was rendered, but they were merely tried together, and each case retained its separate character and a separate judgment was rendered. The predicate of the South Carolina case was otherwise, and the holding in that case is not applicable to the case we have here.

Rhoads v. Booth, supra, is not in point. It was there held that three persons could not maintain a joint action for malicious prosecution. No question of joint trial of separate actions was involved.

In Kimatian v. New England Tel. & Tel. Co., supra, Mary Kimatian sued for personal injuries resulting from alleged negligence of the defendant; and her husband, Charles, sued for loss of his wife's services, etc. The two cases were tried together. On appeal, the Supreme Court said: ''In view of the peculiar facts in the present cases, it seems to us undesirable to try them together. While they possess the common element of defendant's alleged negligence, the question of Mary's and Charles' freedom from contributory negligence is not identical. Conceivably Mary might recover and Charles

be denied recovery. Trial together tended to confuse court, counsel, and particularly the jury. The interests of justice in these cases seem more likely to be promoted by separate trials.''

So far as we can see from the opinion, the above-quoted excerpt states the only reasons which moved the court to hold that a joint trial was improper; and, if so, this case tends to support plaintiff's contention, but it stands practically alone, and opposed to the great numerical weight of authority and what we consider the better reasoning.

It is contended that Mrs. Herstein was prejudiced by the joint trial of the two cases for reasons which are stated on the brief as follows:

''From the outset the alleged disparity in the financial standing and prominence of Mr. Herstein and the defendant was constantly referred to by the defendant's attorney. As has been pointed out before, this was not only highly improper and reversible error, but it forced Mrs. Herstein to have her case tried, not on the question of the liability of the defendants for the injuries which she received, but upon the irrelevant issue of the difference in wealth and social standing between her husband and the defendant.

''There was no contention by the defendant that Mrs. Herstein was not as seriously and permanently injured as both she and her doctors testified. Instead counsel skillfully attempted and apparently succeeded in diverting the attention of the jury from the real issues involved to the false issue of the alleged discrepancy between the wealth of her husband and the defendant.

''As has been pointed out before, the mere sustaining of objections to the improper testimony and arguments could not offset the prejudice to Mrs. Herstein. It is the plaintiff's contention that Mrs. Herstein was greatly prejudiced by the introduction of this incompetent and irrelevant matter and that she is entitled to have her case tried solely on its merits, with all references to her husband's wealth or the defendant's poverty entirely eliminated.''

It is seen that the gist of the proposition contained in the excerpt just quoted from the brief is, that Mrs. Herstein was prejudiced by testimony of witnesses and argument of defendant's attorney relating to ''the difference in wealth and social standing between her husband and the defendant;'' but it is also stated in the quoted excerpt, supra, that such testimony and argument constituted ''incompetent and irrelevant matter,'' and was ''highly improper and reversible error.'' The plaintiff's motion for a new trial below was in large part grounded upon the introduction of this ''incompetent and irrelevant matter,'' and it is made the basis of assignments of error in this court which will be discussed later in this opinion.

▆▆▆ The trial court's order that the two cases be tried together, was, of course, made upon the assumption that the trial would be free from error, and the propriety of the order directing a joint trial must be tested upon that theory. If neither of the plaintiffs would have been prejudiced by a joint trial conducted without error, the action of the court in ordering a joint trial could not have been rendered erroneous by errors which supervened in the course of the subsequent trial. If there was reversible error at the trial, by the admission of incompetent evidence or by improper argument of counsel, the remedy is a new trial because of such errors.

The assignments of error through which plaintiffs complain of the order of the trial court requiring that the two cases be tried together are overruled.

2. An understanding of the main facts of the case and the material points of dispute in the evidence will be necessary to the proper disposition of some of the remaining assignments of error.

Omitting citations to the record, we here quote an excerpt from plaintiffs' brief, which is supported by undisputed proof, as follows:

"On the night of November 27, 1933, Mr. and Mrs. W. R. Herstein, who were then in excellent health, left their home at Stonewall and North Parkway, in the City of Memphis, Tennessee, to attend the 7:00 o'clock performance of a moving picture show at the Linden Circle Theater.

"The Linden Circle Theater is located on the west side of Linden Circle, a little south of the intersection of Linden Circle and South Somerville. South Somerville runs north and south, while Linden Circle curves from the south to the west. There is a small triangular park on the east side of the Circle, opposite the theater, which is bounded by South Somerville, Linden Avenue and Linden Circle. Linden Circle is the main thoroughfare for traffic coming from the southeast part of Memphis to the business district and carries very heavy automobile traffic.

"The Linden Circle Theater is one of the largest suburban theaters in Memphis, and enjoys a large patronage. The theater is situated in the middle of a number of stores. At night the street in front of the theater is well lighted, not only by the lights from the stores, but also by street lights and the lights from the canopy of the theater.

"People constantly crossed at night from the southern point of the triangle to the west side of Linden Circle, to attend the theater and patronize the stores.

"Mr. Herstein parked his Ford coupé facing south on the west side of South Somerville, about 100 feet north of the south point of the triangle. Mr. and Mrs. Herstein walked to the southern point of the triangle and started to cross Linden Circle. Before leaving

the sidewalk they looked to the south and saw a car on Linden Circle headed north, which had stopped at the traffic light at Peabody Avenue, some four hundred or five hundred feet away. Looking to the northwest they saw a car just coming in view around the curve toward them, which was some distance away.''

The testimony is conflicting with respect to the circumstances under investigation after plaintiffs entered Linden Circle and started to walk across it from the southern point of the triangle.

Quoting again from plaintiffs' brief:

''The plaintiffs testified that, thinking they had ample time to cross Linden Circle before either car reached them, they started to walk, side by side, directly across the street at an ordinary pace. Mrs. Herstein was walking by the south side of Mr. Herstein. Upon reaching the center of the street they saw that the car approaching from the northwest was proceeding at a faster rate of speed than had at first appeared. The plaintiffs stopped on the yellow traffic line in the center of the street to let this car pass. After standing on the traffic line some three or four seconds they were struck by a car driven by the defendant which was proceeding north, and which gave no signal of its approach.

''After the collision Mr. Herstein, who was knocked some ten or fifteen feet, was lying in the street several feet west of the center line, while Mrs. Herstein was thrown to a point approximately half way between the east curb and the center line.

''The plaintiffs introduced two witnesses who testified that after the accident the defendant's car was in the center of the street, with the rear of the car some fifteen or twenty feet beyond where Mrs. Herstein was lying.''

In defendant's brief, after stating the undisputed facts substantially as we have quoted them from plaintiffs' brief, it is said:

''The defendant's automobile had stopped at the intersection of Peabody and Linden Circle and as the traffic light changed the defendant drove his car north on Linden Circle. As he approached the point about opposite Linden Circle Theater, he found it necessary to drive about half way between the center line and east curb of Linden Circle, because of automobiles which were parked along the east curb of the triangle. He was traveling between 18 and 22 miles per hour.

''Just as the defendant passed this point opposite the Theater, he saw a man flash up in front of his light, only 8 or 10 feet in front of his car, and this man, the plaintiff W. R. Herstein, seemed excited and threw up his hands. He and his wife then ran directly into the path of defendant's car. The defendant made all possible efforts to avoid the accident and attempted to pull his car to the left and west of the point where the man was first seen, and he applied his brakes and stopped within a car length.

"After striking this man the defendant's car stopped with its left front wheel slightly to the left and west of the center line of the street, but with the remainder of the car on the right or east side of the center line. The defendant did not see the plaintiff, Mrs. W. R. Herstein, until after the collision. The impact of the automobile driven by defendant knocked the plaintiffs in opposite directions. Mrs. Herstein was found lying several feet east of the center line, while Mr. Herstein was, according to their own testimony, three or four feet west of the center line of Linden Circle.

"Both plaintiffs were severely injured and were carried to the Baptist Hospital in separate ambulances."

The testimony of defendant Kemker and his witness Hartie supports the version of the facts above quoted from defendant's brief.

It also appears from the testimony of defendant Kemker that he was well acquainted with the locality where the accident occurred; that he knew the Linden Circle Theater was there and that the show "started" about the hour the accident occurred; that he knew a great many people crossed the street at the south point of the triangle; that he passed that place on his way back and forth from his home almost every night and knew that the lights would blind him at that point.

It appears from the testimony of plaintiffs that they had frequently attended the Linden Circle Theater and knew that traffic was heavy at the point where they were crossing the street when injured. Plaintiffs also stated that they did not look toward the south after they saw a car (defendant's car) standing at the Peabody avenue traffic light, 400 or 500 feet south of them as they were leaving the curb at the apex of the triangle.

3. In the first count of the declaration of each plaintiff it is averred that defendant Kemker was guilty of negligence, in that he was not keeping a proper lookout ahead; that he saw, or in the exercise of reasonable and ordinary care should have seen, that the danger to the plaintiff was imminent, and, notwithstanding such knowledge, he did not do everything possible to avoid injuring plaintiff; that plaintiff was entitled to the prior use of said street and crossing and was in the lawful use of same, but, notwithstanding that fact, the automobile driven by defendant Kemker approached said intersection without being under proper control in order to yield the right of way to one in the lawful use of same; that defendant Kemker gave no warning of his approach to plaintiff by blowing the horn or other warning; that defendant Kemker was not keeping a proper lookout ahead for pedestrians who were in the use of said intersection; that defendant Kemker was operating said automobile at a high and dangerous rate of speed in view of the congested condition of traffic prevailing at the intersection where the accident occurred; and that each of said acts of

negligence was a separate proximate cause of the injuries to plaintiff (which injuries are fully described in each declaration).

It is averred in the second count of the declaration of each plaintiff that the plaintiff's injuries were the proximate result of the violation by defendant Kemker of certain ordinances of the city of Memphis governing traffic of automobiles on the highways of said city, which ordinances are set out in the declaration as follows:

"Sec. 804—Rules of the Road—Vehicles to keep to the right—Every vehicle shall be kept as near the right-hand curb as practicable, except when passing a vehicle ahead.

"Sec. 816—Reckless Driving Prohibited—Any person who drives any vehicle or street car upon a street recklessly or at a speed, or in a manner so as to endanger or be likely to endanger the life, limb or property of any person shall be guilty of reckless driving.

"Sec. 817—Maximum Speed Limit for Street Cars and vehicles other than Trucks—In no event shall any motor vehicle, street car or other vehicle, however operated, be driven on any street at a speed greater than twenty-five (25) miles per hour. In turning a corner at intersecting streets or in turning on a curve or turn in a street, the rate of speed shall not exceed ten (10) miles per hour.

"Sec. 869—Pedestrians—Not to be Interfered with—When—Right-of-way at Street Crossings—Drivers of vehicles shall exercise all possible care not to interfere with or injure pedestrians lawfully in the use of streets, crossings, and crosswalks. When signalled by any traffic officer or traffic control devices the driver of every vehicle shall stop back of the property line at any crossing, leaving it clear for the use of pedestrians."

As before stated, the defendants pleaded to each declaration (1) not guilty, and (2) that the plaintiff's injuries, if any, were received as a direct and proximate result of his (or her) own contributory negligence.

Later, in compliance with an order of the court, made on motion of plaintiffs, that defendants be required to plead specially their affirmative defenses, the defendants filed further pleas as follows:

"They deny that the plaintiff was walking west across Linden Circle at or near the intersection of South Somerville Street, and deny that the plaintiff was crossing at or near the place usually used by pedestrians and deny that while standing on or near the yellow line on said Linden Circle, the defendant, G. H. Kemker, either recklessly, carelessly or negligently ran his automobile into and against the plaintiff.

"They deny that The Newburger Company was the owner of the automobile designated by license number in said declaration and deny that at the time of the said accident, the defendant, Kemker, was using the said automobile in and about the business of the defendant, The Newburger Company.

"They aver that plaintiff's injuries, if any, were received as a direct and proximate result of the plaintiff's own contributory negligence and aver that said plaintiff stepped in front of said automobile so suddenly and in such close proximity to said automobile, that said accident was unavoidable.

"These defendants deny that they, or either of them, were guilty of any one of the acts of negligence alleged against them in said declaration and deny that the plaintiff received the injuries alleged in said declaration."

Each of the plaintiffs, for replication, joined issue on the defendant's pleas.

We will dispose of the remaining assignments of error in the order which to us seems most convenient, rather than in the order of their assignment.

4. The seventh assignment is that the court erred in refusing an instruction to the jury, requested by the plaintiffs, as follows:

"The fact that one is observing the speed limit prescribed by city ordinance does not necessarily prove that he is not going at an excessive rate of speed. He may not be violating a city ordinance and yet his speed may be excessive under all the surrounding facts and circumstances.

"If, for example, he is driving at a rate of speed which is improper and at which a reasonably prudent man would not drive under the same or similar facts and circumstances and is not exercising ordinary care in his rate of speed, he is guilty of negligence even though not violating a city ordinance."

The instruction thus requested contains a sound rule of law applicable to the undisputed facts of this case.

"The quantum of care required of the driver of a motor vehicle is to be measured by the exigencies of the particular situation, and accordingly varies with the surroundings, as the likelihood of causing injury is great or small. The required care is commensurate with the risk of injury to others, having in view the condition of the traffic at the time and place, and the nature and condition of the machine being operated." Caldwell v. Hodges, 18 Tenn. App., 355, 363, 77 S. W. (2d), 817, 822. See, also, Leach v. Asman, 130 Tenn., 510, 513, 514, 172 S. W., 303; West Construction Co. v. White, 130 Tenn., 520, 523, 172 S. W., 301; Taylor v. Arnold, 2 Tenn. App., 246, 251; Berry on Automobiles (6 Ed.), secs. 162 and 183; Vartanian's Law of Automobiles, sec. 55; Anderson's Automobile Accident Suit, sec. 180.

"One may be guilty of operating an automobile at a negligent rate of speed and still be well within the rate prescribed by statute or ordinance." Berry, supra, section 183.

"A charge of negligence is not repelled by a showing that the de-

fendant traveled within the speed limit fixed by law, independent of other circumstances.'' Anderson, supra, section 180, page 196.

The maximum speed limit provided by the city ordinance of Memphis was 25 miles an hour. Defendant testified that he was driving at a speed of 18 to 22 miles an hour. There was no other evidence with respect to defendant's speed, except such inferences as the jury might draw from the effect of the impact upon the bodies of the plaintiffs.

Plaintiffs were entitled to the requested instruction set out in their seventh assignment, unless the jury was sufficiently instructed on that subject in the general charge.

In the charge with reference to the requirements of the common law as to ''how one should drive an automobile,'' the court said:

''In reference to speed, and in reference to control, and in reference to the position on the highway that he is driving, he is required by the law to exercise reasonable and ordinary care, and by that is meant such care as you gentlemen say that a reasonable and ordinarily prudent person, situated like the defendant driver was, would exercise. If he measured up to that standard, then he would not be guilty of negligence, but if he fell below it, then he would.''

The next succeeding paragraph of the charge was as follows:

''It is the duty of the defendant driver to obey the city ordinance. One is required inside the limits of a city to drive his automobile as is required by the ordinances of the city. If one violates an ordinance, then the violation of the ordinance, in law, is an act of negligence in and of itself.''

Later, in the charge, the court undertook to state ''the theory of the plaintiffs,'' but made no suggestion of the contention of plaintiffs that defendant was operating his automobile at a high and dangerous rate of speed in view of the congested condition of the traffic at the place where the accident occurred. With reference to the negligence of the defendant, the court stated that it is the theory of the plaintiffs that ''the defendant was not on the lookout ahead; that he gave no warning of his approach; that he was violating the City Ordinance of twenty-five miles per hour; and also that he was violating the Ordinance in that he was not as far to the right-hand side as practicable, and the other Ordinances which I will read to you again later.''

In a subsequent part of the charge, the court read to the jury all of the ordinances upon which the plaintiffs relied, and with reference to the ''maximum speed limit Ordinance'' said:

''I desire, gentlemen of the jury, to withdraw from you the portion of the last read ordinance which is in these words: 'In turning a corner at intersecting streets or in turning on a curve or turn in a

street, the rate of speed shall not exceed ten miles per hour.' At the request of the plaintiff, and according to my judgment, that provision of the ordinance isn't applicable at this time and should not be considered by you at all in arriving at your verdict, leaving the rest of the ordinance in reference to the speed of twenty-five miles an hour applicable.''

■ We think the jury might have naturally and reasonably concluded from the charge that defendant was not negligent in the matter of speed, unless he was operating his car at a speed in excess of 25 miles per hour in violation of the city ordinance. A statement of the applicable rule is as follows:

''This request was refused, and the case went to the jury without any direction as to the verdict to be rendered if the defendant's version of the facts should be believed. Therein vital error was committed against the defendant, and the consequence of that error' is not avoided by the suggestion of plaintiff's counsel that the court, in the charge given, submitted a proposition more favorable to the defendant than that requested and refused. No speculation can be rightly indulged along the line of that suggestion. It is enough that the proposition referred to as having been given did not, under any legitimate interpretation, embrace the theory of fact presented by the defendant's witnesses.

''It is the indisputable right of every litigant, upon seasonable and appropriate request, to have every material issue of fact on which he has introduced material testimony submitted to the consideration of the jury, with proper legal directions in respect of the verdict to be returned upon the hypothesis that such testimony shall be found to be true. Or, differently stated, every litigant with testimony tending to sustain it is entitled, on proper request, to have his theory of every material issue of fact submitted to the jury on a correct charge of the applicatory law. Souey v. State, 13 Lea, 472; Railroad v. Egerton, 98 Tenn., 541, 41 S. W., 1035; Wooten v. State, 99 Tenn. [189], 195, 41 S. W., 813.

''The present defendant was denied that right, and through that denial it may have lost its opportunity for a favorable verdict. This renders the error material and reversible. That the refused request for instruction was sound in law is too obvious to allow debate or require the citation of authorities. Reverse and remand.'' Memphis Street Railway Co. v. Newman, 108 Tenn., 666, 669, 69 S. W., 269.

We think the plaintiffs were entitled to have the requested instruction as set out in their seventh assignment given to the jury, and that assignment is sustained.

■ 5. The eighth assignment is that the court erred in refusing special instruction requested by the plaintiff, as follows:

"It is the law that where one starts to cross the street and looks in the direction from which he has a right to expect cars, and sees an automobile a sufficient distance away that in the exercise of reasonable care he has a right to presume that said car, if it observes the law and is driven with reasonable care, will not reach him before he crosses that part of the street upon which the approaching car is required by law to drive, he is not guilty of negligence as a matter of law in failing to look again for that car before passing beyond that portion of the street on which the car is required by law to be driven."

The undisputed testimony of the plaintiffs is that as they were leaving the sidewalk on Linden Circle they looked toward the south and saw a car (the defendant's car) on Linden Circle, headed north, which had stopped at the traffic light at Peabody avenue, 400 or 500 feet from plaintiffs; that they walked across the eastern half of Linden Circle at an ordinary pace and stopped on the "yellow traffic line" in the center of the street in order to await the passage of a car approaching from the north (or northwest) on the west side of Linden Circle; that they did not look toward the south after looking in that direction at the sidewalk as before stated; and that they did not see defendant's car after they saw it at Peabody avenue as aforesaid until it struck them where they were standing in the center of the street.

It was for the jury to say whether or not, in the circumstances shown by the evidence, the plaintiffs exercised reasonable and ordinary care in proceeding across the eastern half of Linden Circle without looking toward the south again after leaving the sidewalk.

The requested instruction was so framed that, in the absence of a statement therein of the function of the jury in the respect just stated, it was likely to mislead the jury into the belief that the court meant to instruct them affirmatively that, upon the facts, the plaintiffs were "not guilty of negligence as a matter of law" in failing to look toward the south after leaving the eastern sidewalk of Linden Circle. So understood, the requested instruction, if given, would, of course, have constituted an invasion of the province of the jury.

It is not sufficient that an instruction contains a correct statement of the law. 14 R. C. L., page 756. The instruction should be so framed as "to be readily within the comprehension of men such as jurors, who are not ordinarily educated in the law," and "an instruction so worded that it might convey to the mind of an unprofessional man, of ordinary capacity, an incorrect view of the law applicable to the cause is erroneous." 14 R. C. L., page 770; Lancaster v. State, 3 Cold., 339, 343, 91 Am. Dec., 288.

The plaintiffs' eighth assignment of error is overruled.

█ The ninth assignment is that the court erred in refusing a special instruction requested by the plaintiffs, as follows:

"In the absence of knowledge to the contrary, and in the absence of facts which would charge one, in the exercise of reasonable care, with notice to the contrary, one has a right to presume that people driving automobiles will observe the law and city ordinances.

"Therefore, in the absence of knowledge to the contrary and in the absence of facts which would, in the exercise of reasonable care, charge one with knowledge to the contrary, one has a right to presume that the driver of an approaching automobile will drive as near to the right-hand curb as practicable."

The instruction thus requested contains a correct statement of the law applicable to the facts of this case. Elmore v. Thompson, 14 Tenn. App., 78, 100; Union Transfer Co. v. Finch, 16 Tenn. App., 293, 64 S. W. (2d), 222; Walkup v. Covington, 18 Tenn. App., 117, 124, 73 S. W. (2d), 718 (and authorities cited in these cases).

In his charge the court stated to the jury, as a part of the defendant's theory, that the plaintiffs "rushed to the center of the street, and, without exercising reasonable and ordinary care, put themselves immediately in front of the vehicle that he (the defendant) was driving."

█ The plaintiffs testified that they were standing in the center of the street (on the "yellow traffic line") when the collision occurred, and there is evidence tending to show that defendant had ample room to pass on the east half of the street without striking the plaintiffs, but that he was driving along the center line of the street in violation of the city ordinance which provided that "every vehicle shall be kept as near the right-hand curb as practicable, except when passing a vehicle ahead."

The court did not give the jury, either in words or in substance, the requested instruction copied in the ninth assignment of error, supra.

In the situation of plaintiffs, as claimed by them in their testimony, their right to presume that an automobile approaching from the south would be driven as near the right-hand curb as practicable was highly important in determining whether or not they were negligent, and we think that they were entitled to the instruction requested on that subject. The ninth assignment of error is therefore sustained.

7. The questions presented by the plaintiffs' third, fourth, fifth, and sixth assignments of error are, in some of their aspects, so closely related that we may consider them in the same connection.

The third and fourth assignments are practically the same, and it will suffice for a statement of both to quote the fourth assignment, which is as follows:

"Because of the action of the attorney for the defendants, and especially the defendant, Kemker, in repeatedly and insistently, over objection and exception, intimating, suggesting and, in effect, stating to the jury the alleged disparity between the financial standing and prominence of the plaintiff, W. R. Herstein in the case of W. R. Herstein vs. G. H. Kemker, et al., No. 84,790, and the defendant Kemker, said statements and intimations being to the effect that said plaintiff Herstein was a wealthy man and said defendant Kemker a poor man, and that the effect of a verdict against said defendant would be disastrous to him; and because of the action of said attorney in intimating and, in effect, stating that the defendant, Kemker, was not covered or protected by liability insurance, when said Kemker was in fact so covered.

"The effect of said intimations and statements was to prejudice this plaintiff and arouse the sympathy of the jury on the ground that Kemker was a poor man, with a family, and that a verdict would be disastrous to him, and that the plaintiff W. R. Herstein and this plaintiff were people of affluence who did not need the verdict for this reason."

Through their fifth assignment, the plaintiffs assert that certain "improper matters" were "brought before the jury by the defendant," and copious quotations from the record showing these alleged "improper matters" are copied into this assignment—covering about 12 pages of the typewritten brief—which we shall not undertake to quote here, but to parts of which we will refer. The concluding statements of the fifth assignment are as follows:

"These statements made on behalf of the defendant, and questions asked and answers elicited thereto had the inevitable tendency of impressing the jury that the defendant Kemker was a man of small means and the plaintiff W. R. Herstein a man of large means, that Kemker was a man of family, with a war record, that he was unprotected by insurance, and that a verdict against him would be disastrous to him financially. It was thus prejudicial to plaintiff in that it injected into the lawsuit prejudicial matters, irrelevant, and having no connection therewith, and was not consistent with the facts in that the said Kemker was and is protected by liability insurance in this case.

"These questions, answers and statements were persisted in over the objection and exception of plaintiff and amounted to a persistent attempt to bring before the jury the alleged non-existence of insurance and the alleged poor financial condition of the defendant Kemker."

The sixth assignment is as follows:

"Because of the following statement of the attorney for the defendant:

"'If your Honor please, the declaration sued for punitive dam-

ages, and that entitled us to prove his financial condition and Mr. Herstein's financial condition, and I think I am entitled to prove these facts. I want to show what his situation in life is, because that is involved in this question, to show what he has, what his financial condition is, how it would affect him if special damages were given, and I want to show Mr. Herstein's financial condition, too.'

"This was prejudicial because, regardless of whether punitive damages were or were not claimed, the plaintiff Herstein's financial condition was irrelevant and immaterial and because it was improper, regardless of whether punitive damages were claimed, to show the plaintiff Herstein's financial condition and at the same time intimate, suggest and, in effect, state that the defendant was not covered by liability insurance, whereas in fact he was so covered and protected."

Preliminarily it is suggested in the written argument of defendant's able counsel that an appellate court will only reverse for errors committed by the trial judge.

All of the matters contained in the assignments of error in this court were embraced in the plaintiffs' motion for a new trial below, and if they, or any of them, were sufficient to deprive the plaintiffs of a fair trial and to entitle them to a new trial, a reversal would, of course, be a reversal because of the error of the trial judge in overruling the motion for a new trial. In such case the specific assertion need not be made in the assignments of error that the trial court erred in overruling the motion for a new trial. Louisville & N. Railroad Co. v. Evins, 13 Tenn. App., 57.

To some of the matters embraced in the assignments now under consideration there was no objection below, and to others of such matters objections by plaintiffs were sustained by the trial court. As to these matters defendant invokes the rule that, on appeal, there can be no complaint of alleged prejudicial matters which were not seasonably objected to below and the objection overruled. This is the well-settled general rule, with the exception that "one ruling on one question is enough, and a repetition of similar exceptions is not to be required, if, indeed, to be tolerated." Gulf Refining Co. v. Frazier (Tenn. App.), 83 S. W. (2d), 285, 299, and cases there cited.

On the other hand, the plaintiffs rely upon the rulings in the cases of English v. Ricks, 117 Tenn., 73, 95 S. W., 189; Pullman Co. v. Pennock, 118 Tenn., 565, 102 S. W., 73; Tubb v. Boyd, 13 Tenn. App., 432, and Nashville, C. & St. L. Railway Co. v. Mangrum, 15 Tenn. App., 518, in which cases it was held that the conduct of an attorney in continuing to get improper and prejudicial matter before the jury, after the trial judge had sustained objections to such matter, was reversible error.

It is contended for plaintiffs in the instant cases that, by reason

of the conduct of the defendant's attorney in thus getting "improper matters" before the jury, these cases were not tried on the true issue of the liability of the defendant for the injuries received by the plaintiffs, but instead, upon the issues of whether or not plaintiff W. R. Herstein, a man of wealth and social prominence, and his wife should recover from the defendant, "a poor war veteran," without liability insurance, upon whom the burden of a verdict would be financially disastrous.

Summarized and abbreviated as far as practicable, the alleged "improper matters brought before the jury," as stated in the assignments of error, are as follows:

(a) In the examination of the trial jury on their voir dire, defendant's counsel asked the jury the following question:

"Q. Gentlemen, Mr. Herstein, as probably most of you know, has been a very prominent man in Memphis for years. How many of you have been drawn into any activities, and come into more or less intimate contact with him in the various activities he has been engaged in in Memphis for a number of years?"

(b) Again, on voir dire, defendant's counsel asked:

"Q. Gentlemen, would Mr. Herstein's prominence in this community cause any of you to lean a little more towards his side of this lawsuit than it would toward Mr. Kemker, who is not so prominent as Mr. Herstein is?"

There was no objection to either of the two foregoing questions.

(c) On voir dire examination of the jury, defendant's counsel asked a further question as follows:

"Q. Mr. Armstrong asked you something about your connections with insurance companies. Sometimes jurors assume that defendants have insurance in lawsuits like this. Sometimes they do the defendant a grave injustice by assuming it. I want to ask each and every one of you whether you will assume that the defendant has insurance in this case just because of Mr. Armstrong's questions, or for any reason?"

Thereupon in the absence of the jury plaintiffs' counsel objected to "that question, or any line of questions asking the jury to assume either that the defendant has or has not insurance."

After an extended argument of counsel, the trial judge ruled that he would permit defendant's counsel "to ask the question of the jurors, if they will assume, without any proof, that the defendants are covered by insurance." To which ruling plaintiffs' attorney excepted.

The jury returned and defendant's attorney thereupon asked the jury the following question:

"Q. I want to ask each and every one of you gentlemen this ques-

tion, whether you will assume, when you go in the jury room, or at any time during this trial, that these defendants do have insurance, or there is any insurance company defending the suit, or anything like that, if there is no proof of it? In other words, if there is no proof of that fact, will any of you assume that and take that into consideration in arriving at your verdict? I take it by your silence there is no gentlemen on the jury will do that?"

(d) In the course of the voir dire examination of the jury, two jurors were challenged and excused, and two other members of the panel were called and interrogated, and, among other questions, defense attorney asked them the following:

"Q. I asked the jury this question awhile ago, and I would like to ask you and Mr. Talbert, both, would either one of you be influenced in any way by the prominence of Mr. Herstein—would the fact he is a very prominent man in Memphis, and he has been a very prominent man and very active in big business in Memphis for many years, cause you to lean more to his side of the lawsuit than you would to Mr. Kemker, who is probably not as prominent in business affairs and financial affairs as he is?

"Mr. Talbert: It wouldn't influence me either way.

"Mr. Sayre: It would have no effect on me.

"Q. That applies to each and every one of you on the jury, I believe. Mr. Sayre, would you assume that the defendant, Mr. Kemker, or the Newberger Cotton Company has any insurance in this case, from Mr. Armstrong's questions he has asked you, or from anything else there is no proof about, if they don't prove it in the lawsuit? A. No, sir.

"Q. You would not, Mr. Talbert? A. No, sir."

(e) Defendant's attorney concluded his opening statement to the jury as follows:

"We ask you to just follow the evidence through, and when it is all in, weigh it carefully, because it is a more serious thing to Mr. Kemker than it is to Mr. Herstein, because of their relative stations in life,—and unless you find from the evidence that Mr. Kemker was guilty of some negligence which caused this accident, then we are going to ask you to return a verdict in his favor. If, however, we say to you, if you find from the evidence he was to blame for it, he was the person that caused it, and they were blameless, then, hard as it would be on him, it would be your duty to give a verdict in favor of the plaintiffs in this case."

No objection was offered to any part of the opening statement of defendant's attorney.

(f) In the course of the cross-examination of plaintiff W. R.

708

Herstein by defendant's attorney, certain questions were asked and answered and objection thereto made and sustained, all as follows:

"Q. Now, you say you were at that time with Reichman-Crosby— vice-president of Reichman-Crosby Company? A. Yes, sir.

"Q. What kind of business is Reichman-Crosby in? A. Machine supplies and electrical supplies.

"Q. You are now retired? A. Well, I finished up my job with Reichman-Crosby, or, at least, they turned over the business to some of the older employes to run, and I am out of a job. I don't intend to retire if I can get another job.

"Q. You are not suffering any? A. I have enough means to live on for a reasonable length of time.

"Q. You were formerly the owner of an electrical supply company? A. I was part owner.

"Q. Part owner? A. Yes, sir.

"Q. And in 1929, you sold your stock in that to the General Electric Company?

"Mr. Armstrong: I object to all that, if your Honor please; it is not relevant to any issue in this case at all.

"The Court: The objection is sustained."

(g) In the course of the examination in chief of defendant Kemker by his attorney, questions were asked and answered which, together with objections by plaintiffs' attorney and the court's rulings thereon, were as follows:

"Q. You say you have lived in Memphis all your life? A. Born here, yes, sir.

"Q. Have you a family? A. Yes, sir.

"Q. How many?

"Mr. Armstrong: I object to that.

"A. Wife and three children.

"Mr. Armstrong: I object to that.

"Mr. Taylor: We found out all about Mr. Herstein's family.

"The Court: I believe I will let him show that.

"A. Shall I repeat it?

"Q. Yes. A. I have a wife and three children.

"Q. Your children, I believe, are how old?

"The Court: The objection is sustained to that.

"Q. Were you in the army during the war? A. Yes, sir.

"Mr. Armstrong: I object to all that.

"The Court: The objection is sustained to that."

(h) During the argument of defendant's attorney to the jury, the following occurred:

"Mr. Taylor: Gentlemen, if you don't believe I am on a tough spot, you ought to be where I am now. I came up here trying to pro-

tect the rights of one of my close friends of years' standing. We have reached the point in the lawsuit now where it is a question of who can best argue the lawsuit, Mr. Armstrong or me, and that puts me on a mighty tough spot.

"Mr. Armstrong: I will give up.

"Mr. Taylor: He will give up—you ought to see him up at the office, how he smiles about these good arguments he makes,—but that is neither here nor there. I am on a tough spot, I know. You have got a lawsuit here in which I don't believe Harry Kemker is to blame. I don't believe he did anything for which he is to blame, but I feel though a lot of responsibility I have got here, because if Mr. Armstrong can, by his superb ability as a lawyer and as an orator, and the way he can impress people with his ideas with the force of his argument and personality, if he can do that, then I don't know, my friend Harry Kemker may have a verdict rendered against him that may ruin his life—

"Mr. Armstrong: I object to that argument.

"Mr. Taylor: I thought you would.

"The Court: I think that is objectionable, Mr. Taylor—the effect of the verdict is immaterial.

"Mr. Armstrong: I object to counsel's response.

"The Court: I agree with you as to that."

(i) Defendant's attorney made further statements in his argument to the jury, and an objection to the concluding sentence thereof was made by plaintiffs' attorney and sustained by the court, all as follows:

"He freely and voluntarily said to Mrs. Kemker, I wish Harry would quit worrying about this thing, because we absolutely know he is not to blame for this accident. Take that testimony of Herstein in that expression with what he gave in the court room—take that along with it and see which is the more reliable, which is the more likely to be reflecting what actually happened. Think of it, Mr. Armstrong says he was just talking out of the kindness of his heart, just a kind charitable act. What has caused all this reversal of his kindness. Something has come about now. He has changed up. He is not so kind any more about it. He wants a great big judgment now against Harry Kemker now. Something has happened to that kindness and charity. It wasn't kindness. We are just relying on what he said out there at a time when he hadn't decided to sue.

"As I see this lawsuit, there is not a whole lot to stay here and argue about for a long time, but just be sure, be sure you are getting it right now, and we wont have Mr. Armstrong coming up here or sending up and getting an execution every month or two months—

"Mr. Armstrong: I object to that argument, if your Honor please.

"The Court: The objection is well made.

"Mr. Taylor: All right. That is all. Thank you."

(j) In the course of the examination in chief of defendant Kemker by his attorney, the following occurred:

"Q. I believe you say you work for the Newberger Cotton Company? A. Yes, sir.

"Q. What is your salary?

"Mr. Armstrong: I object to that, if your Honor please; that is not competent in this case.

"Mr. Taylor: If your Honor please, the declaration sued for punitive damages, and that entitled us to prove his financial condition and Mr. Herstein's financial condition, and I think I am entitled to prove these facts. I want to show what his situation in life is, because that is involved in this question; to show what his financial condition is, and how it would affect him if such damages were given, and I want to show Mr. Herstein's financial condition too.

"Mr. Armstrong: We withdraw any claim for punitive damages, and I object to the testimony.

"Mr. Taylor: They have sued for it; it is in the declaration, and I think I am entitled to prove it. It is in the declaration. They have been asking for it right up to now, and now they want to withdraw it. I submit I am entitled to show it.

"The Court: All right. Upon his withdrawal of the claim for punitive damages, I rule the evidence incompetent."

It is seen that there was no objection to items (a), (b), and (e), supra.

There were objections to the questions shown by items (c) and (d), but they were overruled, and error is not assigned upon these rulings of the trial court. Moreover, it is said in the brief for plaintiffs that, "We do not argue that if the remarks of counsel had been confined to questions asked in the voir dire examination, that these would constitute grounds for reversal, but we do insist that where they are followed by evidence showing the wealth of the plaintiff and the alleged poverty of the defendant, coupled with the remarks of counsel about the disastrous effect of a verdict upon the defendant, that this conduct constitutes reversible error."

Objections by plaintiffs' attorney to the matters shown in items (f), (g), (h), (i), and (j), supra, were sustained by the trial judge.

So long as plaintiffs were suing for punitive damages, it was competent to show the financial condition of the defendant, for the reason that punitive, or exemplary, damages are intended "to impose a punishment on the defendant, and hold him up as an example to the community." Sedgwick on Damages (9 Ed.), Vol. 1, sec. 347, page 687; Polk, Wilson & Co. v. Fancher, 1 Head, 336, 341; Louisville, N.

& G. S. Railroad Co. v. Guinan, 11 Lea, 98, 103, 47 Am. Rep., 279; Stepp v. Black, 14 Tenn. App., 153, 166. Obviously, a large judgment would be a greater punishment to a man of small means than to a man of great wealth; hence the rule that the defendant's financial condition may be shown in a case where there is a basis for the recovery of punitive damages.

So far as we are aware, it has never been held in Tennessee that the evidence of the plaintiff's financial condition is competent on the issue of punitive damages vel non. The authorities on the point in other jurisdictions are conflicting. See 17 C. J., page 996, sec. 296, and 8 R. C. L., page 634, par. 176, and cases there cited.

Modern editions of standard text-books and later cases disapprove the admission of evidence of the plaintiff's financial condition. Sedgwick on Damages (9 Ed.), vol. 1, sec. 385, page 751; Sutherland on Damages (4 Ed.), vol. 2, sec. 405, page 1317; Griser v. Schoenborn, 109 Minn., 297, 123 N. W., 823; Robertson v. Conklin, 153 N. C., 1, 68 S. E., 899, 138 Am. St. Rep., 635, 21 Ann. Cas., 930; Southern Railway Co. v. Phillips, 136 Ga., 282, 71 S. E., 414.

We think that the poverty or wealth or social position of the plaintiff "has nothing to do with the proper punishment of the defendant, and the better view is that this cannot be shown." Sedgwick, supra, page 751.

The rule is too well settled to need citation of authorities that evidence of the pecuniary condition of either of the parties is not admissible in an action to recover compensatory damages for personal injuries, except in so far as the plaintiff's right to prove a loss of earning power resulting from the injuries may be considered an exception to the rule.

It follows that, on the trial below, evidence of the pecuniary condition of the defendant was competent until the plaintiffs withdrew all claims for punitive damages, but not thereafter; and that it was improper to bring to the attention of the jury at any stage of the trial, by evidence or otherwise, the pecuniary or social condition and status of the plaintiff W. R. Herstein.

The attitude and conduct of defendant's attorney with respect to the pecuniary condition and social status of the parties, respectively (prior to the withdrawal of the plaintiffs' claim for punitive damages), should be considered in the light of the fact that he entertained the view that these were matters which the jury might properly consider, and that this view was supported by a line of cases (from other states) which are cited in his brief (but which we now hold do not announce the better rule).

After the trial judge had ruled that evidence of the pecuniary condition of either party was incompetent, it was the duty of counsel

to abide by such ruling, and refrain from statements in the presence of the jury which, either directly or inferentially, called attention to such matters.

We do not think the record discloses a contumacious disregard of the rulings of the trial court by the defendant's attorney that brings this case within the rule of English v. Ricks, supra, and the other cases in accord therewith. The statement in his argument to the jury that "Harry Kemker may have a verdict rendered against him that may ruin him for life" (item h), and his further statement that, if the jury should get the lawsuit right, "we wont have Mr. Armstrong coming up here or sending up and getting an execution every month or two months" (item i), were improper because of the inferential suggestion of the poverty of the defendant; but in each of these two instances an objection was interposed, and was promptly sustained by the court and there was no request on behalf of plaintiffs for any further action by the court with respect thereto. All of the plaintiffs' assignments of error, except the seventh and ninth assignments, are overruled.

There were sharp conflicts in the evidence with respect to determinative matters, and the refusal of the requested instructions copied into the seventh and ninth assignments of error deprived the plaintiffs of instructions to the jury to which they were lawfully entitled, and which were of such materiality that their absence may have affected the result of the trial.

For the errors thus pointed out, the judgments of the circuit court are reversed, the verdicts of the jury are set aside, and the cases will be remanded to the circuit court of Shelby county for a new trial.

The costs of the appeal will be adjudged against the defendant Kemker. The costs of the circuit court will await the future judgment of that court.

Senter and Anderson, JJ., concur.