Edward B. CAMPEN and Schlumberger Well Services, a Texas Corporation, authorized to do business in the State of Wyoming, Appellants (Defendants),

v.

Charles STONE, Appellee (Plaintiff).

No. 5479.

Supreme Court of Wyoming.

Oct. 21, 1981.

Rehearing Denied Nov. 9, 1981.

Jeffrey J. Gonda and Robert G. Berger, Lonabaugh & Vanderhoef, Sheridan, signed the briefs and appeared in oral argument on behalf of appellants.

Timothy S. Tarver, Koester & Tarver, Sheridan, signed the brief and appeared in oral argument on behalf of appellee.

Before ROSE, C. J., and RAPER, THOMAS, ROONEY and BROWN, JJ.

RAPER, Justice.

This appeal primarily concerns a jury's award of punitive damages [1] against an employer as a result of an employee's willful and wanton misconduct. The employer challenges the award contending that it should not be held liable for punitive damages absent a showing that it—the employer—was guilty of willful and wanton misconduct. Both the employer and employee challenge the remainder of the verdict because of the admission of evidence as to the employer's wealth.

We will reverse and remand for a new trial.

On the morning of April 15, 1980, appellant—Edward Campen—while in the employ of appellant—Schlumberger Well Services—was preparing for a business trip. He was to drive from his home in Billings, Montana, to Casper, Wyoming, in order to address the Wyoming Geological Society on behalf of his employer. During the morning hours Campen took a prescribed valium tablet for chest pains and an Allerest for cold symptoms. Then at lunch he consumed three martinis before setting off for Casper in a company car at around 1:20 p. m.

Sometime between 4:00 p. m. and 4:30 p. m. on Interstate 90 outside of Sheridan, Wyoming, the car Campen was driving collided with the rear end of a 1979 Chevrolet pickup, owned and driven by appellee—Charles Stone. While Stone's pickup truck was totaled in the accident, Stone himself received two compressed vertebrae as a result of the accident. His medical bills totaled $503, and there was testimony that Stone would have a ten percent permanent partial physical impairment as a result of the injuries to his back.

After the collision, an investigating police officer asked Campen to submit to a blood alcohol test, but Campen refused. Campen later pled guilty to driving too fast for conditions.

1. Also known as exemplary damages.

2. It should be observed that the verdict form did not allow the jury the opportunity to make

On June 17, 1980, the appellee filed suit against the appellants. On October 9, 1980, appellee amended his complaint and alleged that Campen, while acting within the scope of his employment, "was driving in a reckless manner with complete disregard for the safety of others and was willfully, wantonly and grossly negligent, which caused the damage to Stone." Appellee prayed for compensatory and punitive damages against both Campen and Schlumberger. Prior to trial the parties stipulated that Campen had been negligent in the operation of his motor vehicle. On December 15, 1980, the trial commenced. During the trial evidence of Schlumberger's wealth was admitted into evidence. On December 17, 1980, the jury returned the following special verdict: [2]

"1. Was Edward B. Campen negligent?

"A. Yes __X__ (You have been instructed that Edward B. Campen and Schlumberger Well Services, Inc., have stipulated that Edward B. Campen was negligent.) [3]

"B. No _____

"2. Was the negligence of Defendant, Edward B. Campen, a proximate cause of the Plaintiff's personal injuries?

"A. Yes __X__

"B. No _____

"3. Determine the dollar amount of damages which Plaintiff Charles Stone suffered as the proximate result of the collision for each of the following items:

"A. Damage to his personal property. (The parties have stipulated that the value of his property is $8,500.00.)    $ 8,500.00

"B. Medical expenses. (The parties have stipulated that $503.00 is a reasonable amount.)    $   503.00

"C. Lost earnings between the date of the collision and the date of the trial.
   $ 6,700.00

"D. Earnings Mr. Stone will lose in the future.    $30,000.00

any finding as to the basis of Schlumberger's liability for punitive damages.

3. The court had typed in this "X".

"E. Past and future loss of enjoyment of life.                                    $ 2,500.00

"F. Past and future pain and suffering.
                                    $ 7,500.00

"4. Was Defendant Edward B. Campen guilty of willful and wanton misconduct on April 15, 1980, which caused the collision?

"A. Yes   X

"B. No  ____

"5. If your answer to Question 6 is in the affirmative state what amount, if any, Defendants should pay as Punitive Damages.

"A. Defendant Edward B. Campen
                                    $ 3,000.00

"B. Schlumberger Well Services, Inc.
                                    $120,000.00"

Judgment awarding damages was entered in accordance with the findings of the jury on December 22, 1980.[4] From that judgment Campen and Schlumberger have appealed.

I

The first issue we must consider on appeal concerns, when may punitive damages be properly awarded against an employer for the misconduct of an employee. When reviewing an award of punitive damages, we must keep in mind that "[p]unitive damages are not a favorite of the law * * *." *Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246 (1977).

"[Punitive] damages have for their purpose the punishment of a defendant in a civil action for wrongful and aggravated conduct and to serve as a warning to others to deter. They are not recoverable to compensate the plaintiff.   * * * "

(Bracketed word substituted.) *Danculovich v. Brown*, Wyo., 593 P.2d 187 (1979). Their justification is not to provide a windfall to plaintiffs and their attorneys, but is, in fact, to publicly condemn some notorious action or inaction upon the part of the defendant. The design of punitive damages is deterence through public condemnation and the damages awarded should be narrowly tailored toward that end. It must always be remembered that if the conduct was outrageous enough, the legislature would have provided a civil or criminal sanction. "Accordingly, our consideration is whether the award for punitive damages in this case can be said to serve a useful purpose as a punishment to a defendant for the protection of the public." *Condict v. Hewitt*, Wyo., 369 P.2d 278 (1962). We will not uphold an award of punitive damages which punishes unjustly or excessively. See *Town of Jackson v. Shaw*, supra, where provision was made for a diminished award and also *Mattyasovszky v. West Towns Bus Company*, 61 Ill.2d 31, 330 N.E.2d 509, 511 (1975).

There exists an important distinction between punitive and compensatory damages. *Town of Jackson v. Shaw*, supra, 569 P.2d at 1253. Where the question raised is one concerning the employer's liability for compensatory damages, this court has said:

"In Wyoming, as a matter of public policy and economic requirement, a master is liable for damages caused by the negligence of his servant while acting within the scope of the servant's employment. * * * " *Combined Insurance Company of America v. Sinclair*, Wyo., 584 P.2d 1034, 1042 (1978).

In the present case Schlumberger, as the employer, conceded that at the time of the

4. The judgment was joint and several against Campen and Schlumberger for the compensatory damages totaling $55,703.00 and costs in the sum of $2,268.66; several against Campen for punitive damages in the sum of $3,000.00 and several against Schlumberger for punitive damages in the sum of $120,000.00. It is noted that this is slightly inconsistent with Instruction No. 4 given by the trial judge:

"Defendant Schlumberger has admitted that Defendant Ed Campen was its employee and

that he was acting within the scope of his employment at the time of the accident. Therefore, Schlumberger is liable for any and all damages, *both compensatory and punitive*, which you award to Mr. Stone.

"Defendant, Ed Campen is individually liable for any compensatory damages awarded, and any punitive damages assessed against him only." (Emphasis added.)

accident Campen, its employee, was acting within the scope of his employment. Consequently, there is before us no question as to Schlumberger's liability for compensatory damages.

Some jurisdictions have held that an employer's liability for acts occurring within the scope of the employment extends to punitive damages as well as compensatory. In fact, according to one well known authority, a majority of courts have adopted this position. Prosser, Law of Torts, 4th Ed., p. 12 (1971).

There is, on the other hand, a substantial and growing number of courts which reject blindly applying the doctrine of respondeat superior to punitive damages. These courts have different rules for the imposition of liability upon the master depending on whether the damages are punitive or compensatory in nature. These courts argue:

"The punitive and deterrent underpinnings of a punitive damages award explain this divergence in vicarious liability doctrine. For whereas the purpose of compensatory damages—compensation of the victim—is accomplished whether payment comes from the master or his misbehaving servant, that of punitive damages—to punish the wrongdoer and deter him and others from duplicating his misconduct—is not. Unless the employer is himself guilty of some tortious act (or omission) because his employee has misbehaved, an award punishing the employer and deterring him and others situated to act likewise (i.e., other employers) makes no sense at all." *Williams v. City of New York*, 508 F.2d 356, 360 (2nd Cir. 1974).

Recently the Florida Supreme Court abandoned the so-called "majority rule." *Mercury Motors Express, Inc. v. Smith*, Fla., 393 So.2d 545 (1981).[5] There that court said:

"We conclude that the principles of law which should be applied in this and in other similar respondeat superior cases

are as follows: (1) An employer is vicariously liable for *compensatory* damages resulting from the negligent acts of employees committed within the scope of their employment even if the employer is without fault. This is based upon the long-recognized public policy that victims injured by the negligence of employees acting within the scope of their employment should be compensated even though it means placing vicarious liability on an innocent employer. (2) Punitive damages, however, go beyond the actual damages suffered by an injured party and are imposed only as a punishment of the defendant and as a deterrent to others. (3) Before an employer may be held vicariously liable for punitive damages under the doctrine of respondeat superior, there must be some fault on his part. (4) Although the misconduct of the employee, upon which the vicarious liability of the employer for punitive damages is based, must be willful and wanton, it is not necessary that the fault of the employer, independent of his employee's conduct, also be willful and wanton. It is sufficient that the plaintiff allege and prove some fault on the part of the employer which foreseeably contributed to the plaintiff's injury to make him vicariously liable for punitive damages." (Emphasis in original.) 393 So.2d at 549.

Other courts have adopted even more stringent tests for determining if an employer shall be liable for punitive damages. The New Mexico Supreme Court stated in *Samedan Oil Corporation v. Neeld*, 91 N.M. 599, 577 P.2d 1245, 1249 (1978), that:

" * * * Whether or not an employee is acting 'within the scope or course of his employment' is not the standard under which punitive damages may be assessed against his employer. This point of law was clearly settled in *Sanchez v. Securities Acceptance Corp.*, supra [57 N.M. 512, 260 P.2d 703] where we said:

**5.** For the law in Florida prior to this recent case see *Life Insurance Company of North America v. Aguila*, Fla.App., 389 So.2d 303, 305 (1980), and *Hartford Accident & Indemnity Company v. U. S. Concrete Pipe Company*, Fla.App., 369 So.2d 451, 452 (1979).

" 'The law of New Mexico, as set forth in [*Stewart v. Potter*, supra, 44 N.M. 460, 104 P.2d 736, and *Miera v. George*, 55 N.M. 535, 237 P.2d 102 (1957)] establishes the rule that a principal is liable for compensatory damages arising out of the tortious act of an employee acting within the scope of his authority * * *; but the principal is not liable for punitive damages for the same act, unless it is proved, *over and above the fact that the agent was acting within the scope of his authority, that the principal participated in, authorized, or ratified the actual tortious conduct of the agent.* (Emphasis added.)'

"Id. 57 N.M. at 516–517, 260 P.2d at 706–707." (Bracketed material in original.)

A similar approach has been followed in Ohio. There in connection with punitive damages, it was recently stated:

" * * * Such damages are awarded as punishment for the malicious intent of the defendant, and not as compensation for the benefit of the plaintiff. *Curry v. Big Bear Stores Co.*, [Ohio Com.Pl., 142 N.E.2d 1684 (1956)]. The employer is not to be punished for the personal guilt of his servant or agent unless the employer authorized, ratified or participated in the wrongdoing. *Tracy v. Athens & Pomeroy Coal & Land Co.* (1926), 115 Ohio St. 298, 152 N.E. 641." *Gray v. Allison Division, General Motors Corporation*, 52 Ohio App.2d 348, 6 Ohio Op.3d 396, 370 N.E.2d 747, 752 (1977).

An almost identical rule has been incorporated in the Restatement, Torts 2d, § 909 and in the Restatement, Agency 2d, § 217C. Both of these sections provide that:

"Punitive damages can properly be awarded against a master or other principal because of an act by an agent if, but only if,

"(a) the principal or a managerial agent authorized the doing and the manner of the act, or

"(b) the agent was unfit and the principal or a managerial agent was reckless in employing or retaining him, or

"(c) the agent was employed in a managerial capacity and was acting in the scope of employment, or

"(d) the principal or a managerial agent of the principal ratified or approved the act."

The comments to the Restatement argue that this rule is the logical result when consideration is given to the purpose behind punitive damages. It would be improper "to award punitive damages against one who himself is personally innocent and therefore liable only vicariously." Restatement, Torts 2d, § 909, Comment (b).

Several states have adopted the Restatement's approach. In *Agarwal v. Johnson*, 25 Cal.3d 932, 160 Cal.Rptr. 141, 603 P.2d 58, 69 (1979), the California Supreme Court acknowledged § 909 of the Restatement, Torts 2d as the law of that state. The Illinois Supreme Court cited § 217C of the Restatement, Agency 2d as authority in *Mattyasovszky v. West Towns Bus Company*, supra, 330 N.E.2d at 512. See also, *Holda v. County of Kane*, 88 Ill.App.3d 522, 43 Ill.Dec. 552, 410 N.E.2d 552 (1980). The Supreme Court of Texas applied the Restatement's test in *Purvis v. Prattco Inc.*, Tex., 595 S.W.2d 103 (1980).

We likewise believe that the Restatement's approach is the best. It is consistent with the purpose behind punitive damages. Further, it is relatively straight forward and easy to apply. Accordingly, we adopt the test as set forth in the Restatement as the one to be used in determining when an employer may be held liable for punitive damages as a result of the misconduct of the employee.

In this case then, in order for the award of punitive damages to have been proper, one of four circumstances must have been present. First, Schlumberger or a managerial agent thereof must have authorized the doing and the manner of the act. Or second, Campen was unfit and Schlumberger was reckless in employing or retaining him. Or third, Campen was employed in a managerial capacity and was acting in the scope of employment. Or finally, Schlum-

berger or one of its managerial agents ratified or approved the act.

However, the jury was only given the following instruction as to when it could award punitive damages against Schlumberger:

"If you find that Defendant Ed Campen was guilty of willful and wanton misconduct, then, in addition to any actual damages, you may also award Mr. Stone punitive damages against Mr. Campen and Schlumberger.

"Punitive damages are not to be considered as compensation to the Plaintiff for the injuries he suffered, but as punishment to the defendants, and as an example to others. In assessing such damages against Defendant Ed Campen you may consider the pecuniary ability of Defendant Ed Campen. In assessing such damages agains [sic] Schlumberger, you may consider the pecuniary ability of Defendant Schlumberger."

In effect, the court told the jurors that if Campen's conduct was willful and wanton, then Schlumberger was vicariously liable for punitive damages. These damages would be awarded separately from any punitive damages awarded against Campen; the measure of the damages would be based upon the wealth of the defendants.

Such an instruction was in the nature of a partial summary judgment against Schlumberger that at least one of the four alternate conditions which would fix liability for punitive damages on the employer as required by the Restatement, Torts 2d, § 909, was present and no issue of fact in that regard existed. Summary judgments are proper only when the evidence fails to raise an issue of fact requiring resolution during a trial. *Madison v. Marlatt*, Wyo., 619 P.2d 708, 716 (1980).

In our review of the record, we have been unable to find that sufficient evidence supporting such a judgment for punitive damages against Schlumberger existed as a matter of law. Though Campen's trip to Casper was within the scope of his employment, no evidence was admitted in this case to show that Schlumberger authorized the negligent manner in which Campen was driving. Further, after the accident there is nothing in the record to indicate that Schlumberger approved or ratified Campen's misconduct. Appellant has pointed out that Campen was not fired after the occurrence and no disciplinary action was taken against him. The Restatement, Agency 2d, § 217C in its comment (b) declares that mere failure to dismiss a servant, unaccompanied by conduct indicating approval of the wrongful conduct, is not sufficient basis on which to impose punitive damages. Thus, the first and fourth elements of the Restatement's test clearly were not present.

As to Campen's fitness, the evidence shows that prior to the accident involved in this case he had an "excellent" safety record. Schlumberger's files indicate that during the 23 years for which Campen had been employed, this was his first accident. Campen admitted that he had received three speeding tickets in the State of Montana between June of 1978 and November of 1979. During redirect examination of a company representative, the following exchange occurred:

"Q Do the records about which you are speaking indicate any sorts of traffic violations by Mr. Campen?

"A No, not to my knowledge.

"MR. TARVER: I have no further questions."

This evidence is insufficient to warrant a legal conclusion that Schlumberger was reckless in allowing Campen to continue to drive though this may be sufficient to at least raise a question in that regard. Even then, it would be tenuous at best. Finally, as to whether Campen was employed in a managerial capacity, the evidence submitted to the jury is again so skimpy as to be inadequate. The best appellee could offer us on the subject is a bare statement not received by the jury, made by Campen during a deposition taken in August of 1980, that his job entailed both sales and supervisory work. No questions were asked regarding what was meant by "supervisory." This alone was insufficient to war-

rant the district court's instruction to the jury that Schlumberger was liable for punitive damages if Campen was guilty of willful and wanton misconduct.

An adequate form of instruction to the jury was offered by appellants which would have properly presented the issue of Schlumberger's liability for punitive damages to the jury but was refused by the court.[6] The law was fully argued and proper objections to the court's instructions timely made.

■ Accordingly, we conclude that the district court improperly instructed the jury as to when punitive damages could be awarded against Schlumberger. *Tolle v. Interstate Systems Truck Lines, Inc.*, 42 Ill.App.3d 771, 1 Ill.Dec. 437, 356 N.E.2d 625 (1976); *Oakview New Lenox School Dist. No. 122 v. Ford Motor Co.*, 61 Ill.App.3d 194, 19 Ill.Dec. 43, 378 N.E.2d 544, 548 (1978). The jury needed to make certain findings, which were not made, before the award of punitives against Schlumberger as a matter of law would have been proper. The award of punitive damages must be reversed and the case remanded for a new trial on that issue.

## II

We must now consider the second issue raised on appeal—whether it was error for the district court to allow evidence of appellants' wealth to be presented to the jury.

Normally, the question of a defendant's ability to pay has absolutely no relevance to the issue of negligence or even compensatory damages and evidence of financial status is inadmissible.[7] On a comparable basis, Wyoming has steadfastly followed the rule that it is error to receive evidence of a defendant's insurance coverage. *Eagan v. O'Malley*, 45 Wyo. 505, 21 P.2d 821, 822 (1933); *Barnette v. Doyle*, Wyo., 622 P.2d 1349 (1981). The danger of prejudice to a defendant of a disclosure of vast resources is obvious; also, a question of invasion of privacy is presented. See *Gierman v. Toman*, 77 N.J.Super. 18, 185 A.2d 241, 245 (1962). The Alabama Supreme Court, concerned about such dangers, has followed the rule for well over a hundred years that "[l]iability for damages cannot be determined by the economic condition of either party." *Southern Life and Health Ins. Co. v. Whitman*, Ala., 358 So.2d 1025, 1027 (1978). This rule recognizes "no distinction between situations involving compensatory and punitive damages." 358 So.2d at 1026.

However, in Wyoming such a distinction is acknowledged. In *Sears v. Summit, Inc.*, Wyo., 616 P.2d 765, 772 (1980), this court stated:

> "It is proper to introduce evidence of a defendant's wealth when punitive damages are requested. And while this court has never held that such proof is mandatory, *Town of Jackson v. Shaw*, Wyo., 569 P.2d 1246, 1255 (1977), we believe that evidence of a defendant's wealth should be introduced when punitive damages are requested. * * *

>      *     *     *     *     *     *

---

**6.** Appellants offered Instruction C:

"Punitive damages can properly be awarded against Schlumberger Well Services, Inc. because of the action of Edward B. Campen if, but only if, one of the following elements has been proven by a preponderance of the evidence by the Plaintiff:

"A. Schlumberger Well Services, Inc. authorized the doing and the manner of the act of Edward B. Campen, or

"B. Edward B. Campen was unfit and Schlumberger Well Services, Inc. was reckless in employing him, or

"C. Edward B. Campen was employed in a managerial capacity and was acting in the scope of his employment, or

"D. Schlumberger Well Services, Inc. or a manager of Schlumberger Well Services, Inc.

ratified or approved the actions of Edward B. Campen."

**7.** *Barnes v. Sand Mountain Elec. Co-op.*, 40 Ala.App. 88, 108 So.2d 378 (1958); *Packard v. Moore*, 9 Cal.2d 571, 71 P.2d 922 (1937); *Baggett v. Davis*, 124 Fla. 701, 169 So. 372 (1936); *Hooks v. Sanford*, 29 Ga.App. 640, 116 S.E. 221 (1923); *Dawson v. Shannon*, 225 Ky. 635, 9 S.W.2d 998 (1928); *Taulborg v. Andresen*, 119 Neb. 273, 228 N.W. 528 (1930), 67 A.L.R. 642; *McDonnell v. Merrill*, 79 N.H. 379, 109 A. 264 (1920); *Laidlaw v. Sage*, 158 N.Y. 73, 52 N.E. 679 (1899); *Herstein v. Kemker*, 19 Tenn.App. 681, 94 S.W.2d 76 (1936); *Blankenship v. Rowntree*, 219 F.2d 597 (10th Cir., 1955); 1 JONES ON EVIDENCE §§ 4:47–:49 (6th ed. 1972); 22 Am.Jur.2d Damages, §§ 319–320.

"Evidence of a defendant's wealth is important because it is one of three factors that should be considered by the jury when making an award of punitive damages and by the appellate court in reviewing the award. The factors that should be considered are: the nature of the tort; the amount of the actual damages; and the wealth of the defendant. * * *"

Compensatory damages have been designed to attempt to make a plaintiff whole again; punitive damages are aimed at punishing in a degree equivalent to the level of moral or social culpability attached to the defendant's misconduct. As a result, before assessment of punitive damages is allowed, courts have historically required a finding that the defendant's action "was committed maliciously, willfully, or by some form of wantonness." *Wilson v. Hall*, 34 Wyo. 465, 468, 244 P. 1002, 1003 (1926). This malice requirement has served as a means of ensuring that the defendant's misconduct merits punishment. Evidence of a defendant's wealth must be provided the jury in such a manner so as not to interfere in the deliberations on whether willful and wanton conduct is present. As one commentator observed:

"* * * It is a good guess that rich men do not fare well before juries, and the more emphasis placed on their riches, the less well they fare. Such evidence may do more harm than good; jurymen may be more interested in divesting vested interests than in attempting to fix penalties which will make for effective working of the admonitory function. * * *" Morris, Punitive Damages in Tort Cases, 44 Harv.L.Rev. 1173, 1191 (1931).

Thus, any procedure which is employed as a means of presenting this evidence should be designed to allow the defendant's conduct to be judged in a prejudice-free atmosphere. Only when this goal is attained will evidence of wealth constitute a meaningful deterrent which "in the hands of astute counsel can [not] be used to prejudice the jury and becloud the issue." *Morris*, supra, 44 Harv.L.Rev. at 1191.

Evidence of wealth is irrelevant and prejudicial in most instances, but has generally been allowed when a question of punitive damages has been raised. This provides an obvious way to circumvent the import of *Eagan*, supra, when a wealthy defendant is involved. Plaintiffs merely need to claim they are entitled to punitive damages. Not only may the evidence of wealth affect the determination of whether punitive damages should be awarded, but it may further encourage compensatory damages to be based upon the defendant's ability to pay.

Several states have grappled with this problem.[8] One of the more important opinions in the area is *Gierman v. Toman*, supra, 185 A.2d 241. There the court said:

"The information sought appears to be relevant to the subject matter of this suit since malice is an ingredient of a malicious prosecution action and punitive damages are demanded.

"Is the sequence of proof to be controlling? Should malice be first established before a party has a right to such information? * * * There is no connection between a defendant's wealth and compensatory damages but there is such connection when exemplary damages are demanded. The obviously objectionable features of the present demand are invasion of a traditionally personal and private domain as well as inconvenience of disclosing details. Strictly speaking, orderly procedure requires liability to be proved before damages are available. However, since pretrial discovery precedes proof, should a prima facie showing of the right to damages support such a demand? Defendant, even when successful in litigation, absorbs unrecoverable costs and inconvenience. While orderly procedure is preferable, deviation is com-

---

8. Four states do not allow punitive damages unless authorized by statute: Louisiana, Massachusetts, Nebraska and Washington. See, *Moore v. Blanchard*, 216 La. 253, 43 So.2d 599 (1949); *Boott Mills v. Boston & M. R. & R.*, 218 Mass. 582, 106 N.E. 680 (1914); *Wilfong v. Omaha & Council Bluffs St. Ry. Co.*, 129 Neb. 600, 262 N.W. 537 (1935); *Anderson v. Dalton*, 40 Wash.2d 894, 246 P.2d 853 (1952), 35 A.L.R.2d 302.

mon practice. The exigencies of a trial require departure at times. However, where a right of a litigant to insist on orderly procedure raises a substantial question of prejudice, albeit of an intangible nature, the strict adherence to procedure seems called for where the character of the harm is irreparable. * * * Just and orderly procedure here requires that prima facie proof of the right to recover punitive damages should precede the right to a general disclosure of wealth; and as to specific details such as requested here, the rules furnish sufficient protection against abuse and harassment." 185 A.2d at 244.

In 1975 a New York court carried Gierman further:

"It was also ruled in *Gierman* (supra) that evidence of defendant's wealth could not be brought out upon the trial unless and until the jury has brought in a special verdict that plaintiff is entitled to punitive damages against defendant. This approach has been recommended in a note in 21 St. John's Law Review, pp. 198 at 201–202. We adopt this procedural principle.

\* \* \* \* \* \*

"Defendant's wealth should not be a weapon to be used by plaintiff to enable him to induce the jury to find the defendant guilty of malice, thus entitling plaintiff to punitive damages. To avoid such possible abuse, we conclude that the split trial procedure should be used, and that the Court should take a special verdict as to whether defendant was guilty of such conduct that plaintiff is entitled to punitive damages. Not until plaintiff obtains such a special verdict that he is entitled to punitive damages is it necessary or important for him to know defendant's wealth.

\* \* \* \* \* \*

"We recognize that in some respects this procedure may delay the final disposition of a case. But such delay will be compensated (1) by the protection of defendants from harassment by discovery of their net worth in cases where plaintiffs have only alleged, but have not established, a cause of action for punitive damages and (2) by the time saved in barring such discovery in cases where plaintiff cannot prove that he is entitled to punitive damages. Moreover, the limited discovery to which a plaintiff is entitled as to defendant's wealth in a punitive damage case should be conducted expeditiously, and in most cases it should be completed and the necessary evidence be available for presentation to the same jury which rendered the special verdict." *Rupert v. Sellers*, 48 A.D.2d 265, 368 N.Y.S.2d 904, 912–913 (1975).[9]

The ruling in *Rupert* was examined and discussed at length in a recent law review Note, The Use of Evidence of Wealth in Assessing Punitive Damages in New York: *Rupert v. Sellers*, 44 Alb.L.Rev. 422 (1980). There the import of the case was noted as follows:

"The most fundamental element of the Rupert decision is its holding that evidence of wealth is admissible with respect to the assessment of punitive damages. This holding reflects the view that evidence of a defendant's wealth, when coupled with evidence of his culpability, provides a realistic guide for the assessment of damages that will, in fact, punish the defendant. Thus, utilization of evidence of wealth is consistent with the punishment and deterrence objectives of punitive damages.

"Utilization of evidence of a defendant's wealth is also consistent with the secondary functions performed by the punitive damages sanction. The jury, as societal representatives expressing indignation toward conduct motivated by malice, is better equipped to do so in a system where punitive damages are not assessed in an evidentiary vacuum. Furthermore, potential plaintiffs, confronted with a sys-

---

**9.** This procedure was followed in *Doralee Estates, Inc. v. Cities Service Oil Company*, 569 F.2d 716, 723 fn. 9 (2nd Cir. 1977).

tem in which juries can express societal disapproval with reference to economic realities, will be encouraged to bring suit against those who have committed tortious wrongs. The anticipation of awards proportional to a defendant's wealth can serve as an incentive for the commencement of such suits by neutralizing the inherently negative factors of delay and expense that accompany litigation. Thus, allowing evidence of wealth to serve as a factor in punitive damages awards effectively may encourage individuals harmed by wrongful conduct to bring the tortfeasors into the courtroom.

"It must be noted that Rupert, while allowing evidence of the defendant's wealth to serve as a consideration in the assessment of punitive damages, does not allow such evidence into the trial indiscriminately. Rather a split trial procedure is utilized—no evidence of wealth is allowed unless and until the jury has returned a special verdict authorizing an award of punitive damages. This two-phase requirement makes it possible for the defendant's conduct to be evaluated free from the influence of his financial status. Splitting the trial into two phases thus effectively balances the interests of the defendant with those of society by insuring that liability in the first instance will be based solely on the presence of a tortious wrong, while at the same time allowing the jury to assess a *meaningful* punishment when the defendant's conduct merits the imposition of punitive damages.

\*　　\*　　\*　　\*　　\*　　\*

"In passing, it should be noted that the Rupert proposal provides that the same jury which decides the issue of liability, determine the amount of punitive damages. This approach is wise as the jury which hears evidence of the defendant's conduct is in the best position to assess punitive damages." (Emphasis in original and footnotes omitted.) 44 Alb.L. Rev. 437–440.

The New York procedure was reviewed by California in *Cobb v. Superior Court,* *County of Los Angeles,* 99 Cal.App.3d 543, 160 Cal.Rptr. 561 (1979). The court there said:

"In the first instance we conclude that the trial court correctly disposed of the motion to bifurcate based upon the holding of the Supreme Court in *Coy v. Superior Court,* 58 Cal.2d 210, 23 Cal.Rptr. 393, 373 P.2d 457. In *Coy* the Supreme Court held that in an action for punitive damages, evidence of a defendant's financial condition is admissible at trial for determining the amount that it is proper to award. It further held that his financial condition is relevant to the issue and is properly discoverable, and it concluded that the trial court in that case 'erred seriously in holding that plaintiff must wait until after he obtains a judgment in order to obtain such information.' \* \* \* Ordering bifurcation of discovery regarding financial condition until a special verdict on the right to punitive damages has been obtained flies squarely in the face of the holding in the *Coy* case, for the essence of bifurcation is to await favorable outcome for the plaintiff on the underlying cause of action, a prerequisite for punitive damages.

"Petitioners rely upon a holding in New York ordering bifurcation of discovery and trial where punitive damages are involved as a means of insuring protection from disclosure of a defendant's financial affairs. \* \* \*

"It is interesting that the New York court was aware of the existence of the Coy case and its holding because it cited it. It also appears that the New York court relied upon *Gierman v. Toman,* 77 N.J.Super. 18, 185 A.2d 241, Law Division New Jersey Superior Court, as precedent for its own ruling. However, we do not read the New Jersey decision as requiring a special jury verdict on punitive damages before permitting discovery. Rather, what the New Jersey court concluded was that a prima facie showing had to be made of the right to recover punitive damages before a general disclosure of a defendant's wealth can be compelled. \* \* \* " 160 Cal.Rptr. at 564–565.

A Tennessee court rejected the New York procedure on the basis that an undue delay might occur if discovery was not allowed until after the return of the special verdict. As a result the Tennessee court feared that a new jury could possibly be required. *Breault v. Friedli*, Tenn.App., 610 S.W.2d 134 (1980).

Both the California and Tennessee courts concluded that the best approach was just to require a prima facie showing that the misconduct of the defendant warranted punitive damages. Once such a showing was made, discovery of a defendant's wealth would be permissible and whatever evidence was found would be admissible during the trial.

We do not understand the reluctance of the California and Tennessee courts to adopt the bifurcation of the trial. If the wealth of a defendant is allowed to be discovered prior to trial upon a prima facie showing of willful and wanton misconduct, no unnecessary delay will occur.[10] Such an

approach does not interfere with the use of such evidence to peg an appropriate punitive damages award. In fact the New York approach makes good sense. The plaintiff receives an appropriate redress for the wrongs he has suffered, the defendant is provided a prejudice-free atmosphere in which his liability may be assessed, and our society's interest in effecting punishment and deterrence for socially outrageous conduct is preserved. There is no need for a jury to know of defendant's resources while it is determining the amount of compensatory damages. So long as discovery is allowed before trial, there should be no delay once a jury decides punitive damages should be awarded. The evidence of a defendant's wealth can be submitted right then, and the jury can deliberate further on the proper amount to be awarded. Such a procedure should be employed in a flexible manner which both fosters the aims of justice and insures the judicial system's ability to deal with the variety of factual situations that may arise.

---

10. Rule 26(b)(1), W.R.C.P., provides:

"(b) *Scope of discovery.*—Unless otherwise limited by order of the court in accordance with these rules, the scope of discovery is as follows:

"(1) In General.—Parties may obtain discovery regarding any matter, not privileged, which is relevant to the subject matter involved in the pending action, whether it relates to the claim or defense of the party seeking discovery or to the claim or defense of any other party, including the existence, description, nature, custody, condition and location of any books, documents, or other tangible things and the identity and location of persons having knowledge of any discoverable matter. It is not ground for objection that the information sought will be inadmissible at the trial if the information sought appears reasonably calculated to lead to the discovery of admissible evidence;"

There is no need for delay if the plaintiff makes a pretrial prima facie showing that punitive damages is a viable claim and evidence of entitlement will be presented at trial. When the plaintiff seeks discovery of financial status prior to trial, defendant may ask for a protective order requiring such a showing before such discovery proceeds, under Rule 26(c), W.R.C.P.:

"(c) *Protective orders.*—Upon motion by a party or by the person from whom discovery is sought, and for good cause shown, the court in which the action is pending or alternatively, on matters relating to a deposition

to be taken within the state, the court in the district where the deposition is to be taken may make any order which justice requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including one (1) or more of the following: (1) that the discovery not be had; (2) that the discovery may be had only on specified terms and conditions, including a designation of the time or place; (3) that the discovery may be had only by a method of discovery other than that selected by the party seeking discovery; (4) that certain matters not be inquired into, or that the scope of the discovery be limited to certain matters; (5) that discovery be conducted with no one present except persons designated by the court; (6) that a deposition after being sealed be opened only by order of the court; (7) that a trade secret or other confidential research, development, or commercial information not be disclosed or be disclosed only in a designated way; (8) that the parties simultaneously file specified documents or information enclosed in sealed envelopes to be opened as directed by the court.

"If the motion for a protective order is denied in whole or in part, the court may, on such terms and conditions as are just, order that any party or person provide or permit discovery. The provisions of Rule 37(a)(4) apply to the award of expenses incurred in relation to the motion."

In summary, then, we adopt the following approach and procedure for the discovery and presentation of evidence of financial status of a defendant when punitive damages are sought:

1. The plaintiff may claim in his complaint a right to punitive damages and then seek pretrial discovery of a defendant's wealth.

2. Defendant may move for a protective order requiring the plaintiff to make a prima facie showing to the trial court that a viable issue exists for punitive damages. Upon such a showing, the pretrial discovery would be allowed.

3. At trial, if evidence is produced making a prima facie case of punitive damages, the verdict form will make provision for compensatory damages and further ask the jury whether punitive damages should or should not be awarded. However, no provision would be made for the jury to determine the amount of punitive damages to be awarded at that point.

4. If the jury finds that punitive damages should be awarded, it then hears evidence of the defendant's financial status and returns a separate verdict setting the award of punitive damages.

### III

In the case at bar, plaintiff's counsel throughout the trial made repeated references to the vast holdings and wealth of Schlumberger. This was error; the question we must now resolve is whether it was harmless error. While we approve of the inherent soundness of the two rules, holding evidence of defendant's financial condition inadmissible where only compensatory damages are involved, and admissible where punitive damages are warranted, the conclusion is inescapable that the latter rule defeats the purpose of the first. This will occur in any case where both compensatory and punitive damages are claimed and are presented to the jury in an unbifurcated trial.

1. See the Restatement rule set out at p. 1125 of the majority opinion.

In *ABC Builders, Inc. v. Phillips*, Wyo., 632 P.2d 925 (1981), it was said that "[a]n error to warrant reversal must be prejudicial and affect the substantial rights of an appellant." 632 P.2d at 934. The test the court applied was whether there was "a reasonable possibility that in the absence of error the verdict might have been more favorable to [the complaining party]." 632 P.2d at 935.

Here there was contradictory evidence concerning the extent to which appellee's future earnings would be impaired by the accident. It is impossible to say that the jury's verdict of compensatory damages was not affected by its knowledge that Schlumberger had a deep pocket and that the award would be satisfied from that pocket. See Instruction No. 4, supra, fn. 4. Accordingly, we cannot conclude that the error was harmless. We must reverse the entire verdict and remand the case for a new trial on both the compensatory and punitive damages issues. Discovery of Schlumberger's wealth has already been completed so that phase in the new procedure need not be pursued.

Since a new procedural approach is instituted, it will be effective in this case upon the new trial we direct and in all other cases tried on and after thirty days following the date of this opinion.

Reversed and remanded for new trial consistent with this opinion.

ROSE, Chief Justice, dissenting.

As noted in the majority opinion, this appeal asks whether a corporate employer will be held vicariously liable for punitive damages resulting from the misconduct of a nonmanagerial employee. In settling this issue, the majority of the court have adopted the rule embraced by Restatement, Torts 2d, § 909, and Restatement, Agency 2d, § 217C.[1] The appeal has also raised a question having to do with the manner in which evidence of wealth of the corporate employer will be made available to the jury. In response to this second issue, the opinion

adopts a bifurcated-trial scheme in which, contrary to well-established practice in Wyoming, evidence of pecuniary worth of the employer is not submitted to the jury until it has first decided that the employer is liable for punitive damages.

Both of the conclusions enunciated in the majority opinion have raised substantial problems for me, and, for the reasons set out below, I will dissent.

The majority correctly note that the question concerning corporate liability for punitive damages has been a much disputed one. Instead of adopting the compensatory-damage vicarious-liability rule where exemplary or punitive damages are asked of the employer, many states have required that the employer be shown to have participated in, authorized or ratified the actual tortious act of the agent. Other jurisdictions have adopted the Restatement rule. However, the *majority* of the courts have extended the doctrine of vicarious liability to include punitive as well as compensatory damages. The preeminent authority in the field of tort law has stated:

> "The majority of the courts, however, have held that the vicarious liability of the master for acts within the scope of the employment extends to punitive as well as compensatory damages, even in the absence of approval or ratification, and that this is true especially in the case of corporations, who can only act through their agents. They have been concerned primarily with the deterrent effect of the award of exemplary damages, and have said often enough that if such damages will encourage employers to exercise closer control over their servants for the prevention of outrageous torts, that is sufficient ground for awarding them." (Footnotes omitted.) Prosser, Law of Torts, p. 12 (4th ed. 1971).

The Prosser doctrine is typically exemplified in *Stroud v. Denny's Restaurant, Inc.,* 271 Or. 430, 532 P.2d 790 (1975).[2] In that

appeal, the Supreme Court of Oregon rejected Restatement, Agency 2d, § 217C, and adopted a rule which would render the corporation liable for punitive damages where its employee, acting within the scope of employment, was found to have committed such an act as would render the employee liable for punitive damages. The Restatement's philosophy was rejected because the Oregon court was unable to discern any logical validity in the distinction which that rule seeks to make (unsuccessfully, I think) between the acts of a menial versus a managerial employee. *Stroud v. Denny's Restaurant,* supra, 532 P.2d at 792. For me, the Oregon Supreme Court points out a blatant incongruity in the Restatement § 217C approach which has been, in this appeal, adopted by the majority opinion. This flaw asserts itself in the Restatement's underlying assumption that, where acts constituting wilful and wanton misconduct are concerned, a corporation can only act through its *managerial* employees. I would hold that, in the realm of wilful acts, the corporate entity acts through *all* of its employees, as is the case where compensatory damages are in issue.

The flaw in the Restatement's reasoning appears more vivid when it is understood that, according to § 217C, a plaintiff who is injured through the wilful and wanton misconduct of an *officer* of a corporation is eligible for punitive damages from both the officer *and* the corporation; however, as in this case, where the plaintiff is injured by reason of the wanton misconduct of a "*menial*" employee, then the plaintiff must prove some act of authorization on the part of the corporation before punitive damages can be assessed. There is, of course, little doubt that such authorization as the Restatement rule contemplates would necessarily have to come from some managerial employee. Thus under § 217C, a corporation can really only act wantonly or with reckless disregard when such act is committed by a managerial employee, or under managerial authorization.

2. Other cases adopting the majority or Prosser approach are: *Western Coach Corporation v. Vaughn,* 9 Ariz.App. 336, 452 P.2d 117 (1969); *Northrup v. Miles Homes, Inc., of Iowa,* Ia., 204 N.W.2d 850 (1973); *Griffin v. Starlite Disco, Inc.,* 49 N.C.App. 77, 270 S.E.2d 613 (1980); *Clemmons v. Life Insurance Co. of Georgia,* 274 N.C. 416, 163 S.E.2d 761 (1968).

For me, a rule which utilizes different classes of employee action or inaction as justification for charging a corporation with punitive liability is anomalous. I can see no difference between that situation in which an officer injures someone while acting maliciously or wantonly, as compared to the situation in which the same act is committed by any other employee. No matter who the actor may be, it does not alter the character of the act itself. The ability to recover punitive damages has always been dependent upon a finding that the act complained of was done intentionally, maliciously, or with wanton disregard for safety, *Hall Oil Co. v. Barquin*, 33 Wyo. 92, 237 P. 255 (1925); *Cosgriff v. Miller*, 10 Wyo. 190, 68 P. 206 (1902), and it has always been the rule that a corporation can only act through natural persons. I cannot be convinced that any social utility is served in drawing the distinction contemplated by § 217C. It is to be remembered that the purpose of punitive damages is not only to punish the actor but also to deter similar conduct in the future. *Hall Oil Co. v. Barquin*, supra; *Cosgriff v. Miller*, supra. The approach adopted by the majority opinion provides no incentive for corporations to control the acts of their lower-level employees, but rather § 217C informs corporations that liability for punitive damages will only be assessed when an unfortunate plaintiff is "lucky" enough to be injured by the wanton misconduct of an employee in its management hierarchy. The act of any corporate employee done in the furtherance of the corporation's business is the act of the corporation, and the particular corporate status of the actor makes his act no less or no more that of the corporate employer.

I also fail to see the need for the bifurcated trial procedure as a solution for the purported prejudicial effect that evidence of wealth can have on a jury's determination of liability. When punitive damages are claimed, we in Wyoming have never doubted that admission of a defendant's pecuniary wealth is proper evidence to be submitted to the jury. *Hall Oil Co. v. Barquin*, supra; *Cosgriff v. Miller*, supra. The rationale for admitting evidence of wealth is that it provides the jury with a guideline for determining what amount will punish the wrongdoer. *Hall Oil Co. v. Barquin*, supra, 273 P. at 276. Clearly, punishment is one of the ends sought in any award of punitive damages.

We said in *Hall Oil Co. v. Barquin*, supra, that

"The theory, upon which punitive or exemplary damages are generally held in this country to be allowable, is that of punishment of the offender and a warning to others." 273 P. at 275.

I have no quarrel with the majority opinion's position that only evidence of a defendant's net worth should be admitted. I also agree with the opinion where it suggests that such evidence should only be admissible in documentary form. These are constructive suggestions for the control of this type of evidence. I do not feel, however, that it is proper for this court to embark upon the unnecessary procedure of introducing this evidence through a bifurcated-trial process. The bifurcated trial proposed by the majority opinion bottoms its justification on the erroneous assumption that juries always misuse evidence of wealth. This assumption overlooks the fact that in *Hall Oil Co.*, this court established standards to guide a jury in determining the sums that can properly be awarded as punitive damages. 273 P. at 279. It has always been the rule, until today, that an award of punitive damages will be overturned if such award is so disproportionate to actual damages as to signify that the jury was influenced by passion or prejudice. No substantial disparity in the awards in this case was shown, yet the majority opinion has adopted this new bifurcated approach. In light of our rules concerning the admissibility of evidence of wealth and our constant recognition that trial judges have wide discretion in controlling proceedings before them, I fail to see the need for such a two-tiered jury determination.

The trial judge in this case followed the majority rule of vicarious liability and the historically accepted procedure for consider-

ing exemplary damages, and I would have affirmed his judgment which was entered upon a proper jury verdict.